[Crim. No. 10118.   In Bank.   Feb. 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. EARNEST
JAMES AIKENS, JR., Defendant and Appellant.

Barbara Goldeen, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J.—Defendant was indicted for the murders of Kathleen Nell Dodd and Mary Winifred Eaton. The superior court first certified the Dodd case to the juvenile court, because defendant was less than 18 years old when Mrs. Dodd was killed. (See Welf. & Inst. Code, § 604.) The juvenile court declined to take jurisdiction of the case. (See Welf. & Inst. Code, §§ 603; 604, subd. (c); 606.) Defendant was over 18 when Mary Eaton was killed.

Defendant pleaded not guilty to both charges. He, his counsel, and the district attorney stipulated that the two cases could be consolidated and tried by a judge. Judge Berenson found defendant guilty of the first degree murder of both women. As to the Eaton murder the penalty was fixed as death.[1] The appeal is automatic (Pen. Code, § 1239, subd. (b)).

During the penalty trial, evidence was admitted that the defendant had committed a third murder and a rape. Although defendant had not been charged with or convicted of these crimes, the admission of this evidence was proper. (*People* v. *Mitchell,* 63 Cal.2d 805, 815, 816 [48 Cal.Rptr. 371,

[1]The punishment for first degree murder is life imprisonment or death. (Pen. Code, § 190.) The death penalty may not be imposed, however, upon any person who was under the age of 18 when the murder was committed. (Pen. Code, § 190.1.) Defendant's punishment for the Dodd murder was therefore fixed at life imprisonment.

409 P.2d 211], cert. den. 384 U.S. 1007 [16 L.Ed.2d 1021, 86 S.Ct. 1985].)

The facts are as follows: On the evening of April 3, 1962, Kathleen Dodd was at home with her two young children. Her husband was out for the evening. Shortly before midnight someone entered the Dodd home, apparently through an unlocked door. The intruder forced Mrs. Dodd to a railway embankment about 1,000 feet from the house. There he raped her. She managed to escape and ran toward some nearby houses. Her assailant caught her in the driveway of one of these houses and inflicted savage wounds with a knife he had taken from the Dodd kitchen. Mrs. Dodd was found in the driveway by a woman who heard screams and by the woman's son. Mrs. Dodd died as a result of her wounds.

Mr. Dodd returned home about 1:30 a.m. on April 4. He was concerned because the television was on and his wife was not in the house. Mr. Dodd decided to call some of Mrs. Dodd's friends. While looking for the phone book, he discovered that $60 in cash was missing.

Some circumstantial evidence connects defendant with this murder. A package of Salem cigarettes was found in the driveway where Mrs. Dodd died. The defendant smoked Salems. The murder weapon was found on an almost direct path between the murder scene and the defendant's home, three blocks away. Defendant wore a green car coat on the evening of April 3, but the coat was never seen after that. On April 4 the defendant's face bore a fresh scratch that had not been there the day before. Two witnesses also testified that shortly after the murder they attended a crap game where the defendant, who was unemployed, had more than $60.

In addition to this circumstantial evidence, defendant made certain statements that tended to implicate him in Mrs. Dodd's murder. The day after the crime defendant confessed to Mike Dixon, a friend of his. For much of the time between April 1962 and April 1965 the defendant was imprisoned for other offenses. During this period he confessed to three fellow prisoners and made substantial admissions to a fourth. Defendant also made damaging admissions to a deputy sheriff who guarded him during the trial. When Mr. Dodd was on the stand, defendant said "He wouldn't know that unless someone told him." While the woman who found Mrs. Dodd was testifying, the defendant said, "She is saying things that only I know." And later he said that the woman and her son, who had carried a rifle, were "out there to kill me."

Defendant's mother testified that the defendant was at home when the murder was committed. Her testimony was impeached, however, and the judge stated that he did not believe her.

Mary Eaton was raped and stabbed to death on April 26, 1965. The murder occurred in the Eaton home, probably between 11 a.m. and 1 p.m.

Mr. Eaton testified, with admitted uncertainty, that before he left for work the Eaton's grocery purse contained a five-dollar bill, another dollar or two, and some change. He also believed that Mrs. Eaton had two five-dollar bills in her wallet. After the murder neither the purse nor the wallet contained any money.

Before the trial defendant claimed he was home between 10 a.m. and noon on April 26. His mother said that she phoned him there once at 10:25 and again between 10:30 and 10:50. Two prosecution and three defense witnesses placed the defendant in other locations at 10:30, about 10:30, between 10 and 11, between 10:30 and 11:30, and between 10 and 12.

Around noon defendant approached the Shinivar house, which is across the street from the Eaton house. Defendant asked Mr. Shinivar if the latter needed to have his grass cut. Mr. Shinivar said no but offered defendant a dollar to catch a gopher that was burrowing under the Shinivar lawn. Defendant left the Shinivars' and went down the block to the Lopez home. Mrs. Lopez declined to hire defendant, and he left her house at approximately 12:25 p.m. About that time Mr. Shinivar saw defendant approaching the Eaton house.

Sometime before 1 o'clock defendant returned to the Shinivars'. He was carrying a broken cultivator and a straightened coat hanger, which he had obtained at the Eatons'. Defendant poked at the gopher holes for a while. A little after one he left the Shinivars' and walked the one block to his home. His parole agent was waiting there for him.

Circumstantial evidence also connects defendant to the Eaton murder. He was acquainted with the Eaton family and could have secured entry to the Eaton house by guile. Two red wool fibres were found on one of defendant's shirts. These fibers could have come from a blanket in the room where the victim was found. Substantial, though not conclusive, evidence indicates that defendant was wearing the shirt with the fibres when the murder was committed.

On April 26 and April 27 defendant spent about $20, including three five-dollar bills. A great deal of evidence

shows that defendant was broke on the morning of the 26th. However, several weeks earlier his mother had given him $46 or $56 with which to buy clothes; and his mother may also have given him a dollar or two the morning of the murder.

During the evening of April 26 defendant gave Mrs. Eaton's wedding ring to one girl friend and gave Mrs. Eaton's engagement ring to another. At different times defendant offered several explanations of how he came to possess the rings. He said that he found them in the Eaton backyard, that he had owned them for a long time, and that he bought them from a man on a street corner.

Besides defendant's many statements concerning the rings and other matters, defendant made some admissions and suggestive statements. While riding in his parole agent's car on the 26th defendant said, "It seems like every time things start to go well for me something happens to mess it up." Early the next morning defendant told an acquaintance with whom he was returning home, "the police will probably be waiting for me when I gets [sic] back." However, this statement might only reflect defendant's fear that his mother had called the police when he had not come home long after his curfew.

On April 27 defendant told Inspector King, the Ventura chief of detectives, that he had been broke on the morning of the murder. And on April 29 defendant said to Inspector King, "it was between eleven and twelve o'clock when she was dead. I know goddamn well I was at home then." At that time defendant had not been told that Mrs. Eaton died between 11 and 12.

Bobby Williamson, who was in the county jail with defendant, testified that on August 19, 1965, defendant said that he would kill "someone else" if they did not get him out of jail. Mr. Williamson, however, also admitted that he had been released from jail on August 10, 1965. In October defendant told a policeman, "Well, look, I'm a marked man." Defendant then described some of his other arrests and said, "And now a story about some rings, I'm doomed."

Finally, in May of 1965 defendant told a prisoner in the county jail that he (defendant) had killed Mrs. Eaton, but had not raped her.

Defendant's appointed appellate counsel urges six grounds for reversing defendant's convictions: (1) The two cases should not have been consolidated; (2) defendant did not make a knowing and intelligent waiver of his right to a jury trial; (3) Mrs. DeLorenzo testified to a statement obtained

from defendant in violation of his right to counsel; (4) the evidence would be insufficient if the testimony of certain witnesses were disregarded; (5) the court failed to consider whether a subjective mental abnormality prevented defendant from being legally guilty of first degree murder; (6) defendant had ineffective representation by counsel.

██ The two cases were properly consolidated. Although defendant was less than 18 when he murdered Mrs. Dodd, he was 20 when brought to trial for that murder. The juvenile court could have assumed jurisdiction of the Dodd case (see Welf. & Inst. Code, § 604), but it was not required to and refused to do so.

Nor is it relevant on the issue of consolidation that defendant could not receive the death penalty for the Dodd murder. The standards governing the penalty phase of the case could have no bearing on the separate guilt trial.

Section 954 of the Penal Code permits the joinder of two different offenses of the same class. Both the indictments against defendant were for first degree murder; and the pattern of the two crimes was similar (see *People* v. *Sauer,* 163 Cal.App.2d 740, 744 [329 P.2d 962], cert. den. 359 U.S. 973 [3 L.Ed.2d 839, 79 S.Ct. 888]). Furthermore, defendant and his counsel stipulated to the joinder.

██ Defendant made a knowing and intelligent waiver of trial by jury. During the preliminary proceedings defendant's attorneys at first demanded a jury trial. Later they changed their minds and requested a trial by the court. The pretrial judge, Judge Willard, discussed the issue with defendant. The court told him that he had a right to a jury trial, and explained what consequences would flow from waiver of a jury. Defendant said that he understood those matters and had discussed the issue with his counsel. The judge also determined that defendant had not been coerced into waiving a jury, nor had he been promised a more favorable disposition of the case if he waived a jury.

Eight days later the prosecutor told the court that according to reports reaching him "the defendant has made statements indicating that he considers that he has been cheated out of a jury trial."

The court then redetermined that both counsel waived jury trial. Defendant was again told of his right to a jury trial and of the consequences of waiving that right. Defendant again waived trial by jury.

Before the trial began Judge Berenson once again deter-

mined that defendant, his attorneys, and the district attorney waived a jury trial.

Nothing indicates that these repetitions were prompted by the judges' "awareness that the appellant did not in fact understand the full meaning of his waiver." Judges Willard and Berenson simply demonstrated a commendable caution in a capital case to be sure the waiver was intelligently and voluntarily made. Defendant was then represented by and had the advice of counsel. Although he had only a high school education and an intelligence quotient of 90, under these circumstances he was capable of making a knowing, intelligent, and voluntary waiver of his right to trial by jury. The record indicates that he made such a waiver.

■ No problem under the *Witherspoon* case (*Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) is involved because the cause was tried by the judge and not by a jury. ■ Nor can it be successfully contended that there may have been implied coercion in that defendant waived a jury trial because he may have feared that under then existing law he might have secured some death oriented jurors. This point was never raised in the trial court, nor is there anything in the record to show any such implied coercion. As already held, defendant on several occasions made a knowing, intelligent, and voluntary waiver of a jury trial. In the absence of any claim of coercion the trial court is not required to inquire into the issue, whoever may have had the burden of proof had the issue been raised.

■ A point is raised in reference to the testimony of Mrs. DeLorenzo. She was the court reporter for part of the pretrial proceedings. After defendant was indicted for the Dodd murder, a hearing without counsel was held for the purpose of deciding whether the case should be certified to the juvenile court. Defendant asked to see his attorney; but the court continued the hearing. Defendant then said, "1962, when all this took place, all this supposed to have happened, I was at home." Mrs. DeLorenzo testified at the trial that defendant made that statement.

The judge later granted a motion to strike all of Mrs. DeLorenzo's testimony. The court's action renders moot the consideration of whether Mrs. DeLorenzo's testimony was admissible.

■ The evidence was sufficient to support the findings of guilt on both counts. Defendant's out-of-court statements were an important part of that evidence. Many of the most

damaging statements were to prisoners at various institutions. The credibility of those witnesses, like all others, was a question for the finder of fact. Judge Berenson believed that the defendant made the statements attributed to him. The judge's decision can be reversed only if the witnesses' testimony was so improbable as to be entirely unworthy of belief (*People* v. *Wein*, 50 Cal.2d 383, 399 [326 P.2d 457], cert. den. 358 U.S. 866 [3 L.Ed.2d 99, 79 S.Ct. 98], 359 U.S. 942 [3 L.Ed.2d 677, 79 S.Ct. 724], 359 U.S. 992 [3 L.Ed.2d 980, 79 S.Ct. 1122]; *People* v. *Lyons*, 47 Cal.2d 311, 319-320 [303 P.2d 329]); and the prisoners' testimony did not fall into that category. The sufficiency of the evidence without the prisoners' testimony is therefore immaterial.

Judge Berenson did not consider whether a mental abnormality prevented defendant from having the specific intent necessary to commit first degree murder. This was not error. Defendant's behavior at the time of the murders is unknown, because no one witnessed the crimes and defendant did not testify. No lay or expert witness suggested during the guilt trial that defendant had a psychiatric defect.

Defendant did not receive ineffective representation by counsel. He had cocounsel, Mr. Haymaker and Mr. Ashby. They were well prepared, made novel and timely objections, and ably argued the defendant's case.

Mr. Haymaker, who conducted the examination of witnesses until he was hospitalized, occasionally had to request continuances for medical reasons. These continuances were all agreed to by the defendant, however.

During the penalty trial Mr. Haymaker became seriously ill. Mr. Ashby agreed to handle the rest of the case by himself. Judge Berenson asked the defendant if he would agree to be represented solely by Mr. Ashby. The defendant said that he would not. The court nevertheless appointed Mr. Ashby as sole counsel.

It would have been better had the judge determined the nature of defendant's objection, but his failure to do so was not prejudicial error. Mr. Ashby was one of the attorneys originally appointed to represent defendant. He was an experienced criminal lawyer and had been present during the entire trial. All of these facts were known by the court. An indigent defendant does not have the right to representation by a particular lawyer. (*People* v. *Hughes*, 57 Cal.2d 89, 98 [17 Cal.Rptr. 617, 367 P.2d 33].) When Mr. Haymaker became ill four-fifths of the way through the case, Judge

Berenson acted reasonably in appointing Mr. Ashby as sole counsel.

Furthermore, defendant subsequently expressed satisfaction with Mr. Ashby's representation. When Mr. Ashby and defendant disagreed on whether defendant should take the stand, the court appointed a third attorney to consult with defendant.

Inadequate representation by counsel is representation that reduces the proceedings to a farce or sham. (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) Defendant's attorneys never brought the case near to that level.

There is also present an *Escobedo-Dorado* problem that was raised in the trial court and should be discussed. When defendant was arrested at his home early in the morning of April 27, 1965, Inspector King was the first officer to interrogate him. Inspector King gave defendant the proper warnings required by *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], cert.den. 381 U.S. 937, 946 [14 L.Ed.2d 702, 710, 85 S.Ct. 1765, 1793]. But then King stated that ''an attorney would be one that represented his case in court.'' If King meant that defendant was only entitled to an attorney in court, this statement was erroneous. Defendant had a right to counsel during the interrogation. (*People* v. *Thomas,* 65 Cal.2d 698, 704, 705 [56 Cal.Rptr. 305, 423 P.2d 233]; *People* v. *Stockman,* 63 Cal.2d 494, 500 [47 Cal.Rptr. 365, 407 P.2d 277].) But this error in description of the right to counsel, if it be error, only makes questionable the admissibility of the statements given to Inspector King on the morning of April 27 and possibly makes inadmissible the conversation with his parole agent at 5:30 that afternoon, because the parole agent gave no warnings and defendant may have been laboring at that time under the misapprehension created by King's ambiguous description of the right to counsel. But these errors, if they were errors, could not possibly have affected the verdict. The only significant statement made to King and admitted into evidence was that defendant was ''broke'' on the morning of the 26th. But this fact was proved by overwhelming independent evidence. That evidence showed that defendant was without appreciable funds on the morning before the murder, in fact it was shown that he could not then pay even a deposit on a pop bottle. The errors, if they were errors, were not prejudicial.

Defendant was also interrogated by Officer Wharton

between 9:30 and noon on the 27th, but none of this conversation was introduced. Officer Wharton could not remember if he had given the appropriate warnings, but Officer Hronesh testified that he was present when Wharton advised defendant of his rights, and that Wharton told defendant that "He had a right to an attorney, the right to remain silent, that anything he says may be held against him." This advice would not have cured the possible misapprehension created by King's statement.

This whole problem concerning the warnings was clarified during the evening of the 27th when an investigator for the district attorney, Mr. Luna, gave the defendant proper advice including the admonition that defendant had the right to be represented by counsel "at all stages of the interview."

Thus, there was no appreciable *Escobedo-Dorado* error.

Nor does the fact that defendant was a minor make his statement inadmissible. The majority of this court have adopted the doctrine that a minor may constitutionally waive his constitutional rights the same as an adult, except that in determining the issue of coercion, if charged, the "totality of circumstances" should be carefully scrutinized. (*People* v. *Lara*, 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202]; but see my dissent 67 Cal.2d 395.)

It is true that the arresting and prosecuting officials did not inform defendant's mother of his right to counsel and silence, but under *People* v. *Lara, supra,* such advice is not required. Under the majority rule laid down in *Lara* it must be held that defendant intelligently waived his rights.

Involved in this and all other death penalty cases is the constitutionality of the procedures adopted in this state to impose that penalty. This problem was disposed of adversely to defendant's contentions in *In re Anderson* and *Saterfield,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. Under the authority of the majority rule laid down in that case it must be held that the questioned procedures are constitutional.

The judgments are affirmed.

Traynor, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.