[Crim. No. 12941. In Bank. July 13, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN BRITTON MILLER, Defendant and Appellant.

## COUNSEL

Joseph L. Bortin, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Edsel W. Haws and Arnold O. Overoye, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant appeals from a judgment entered after a trial to the court, convicting him of assault with a deadly weapon and first degree murder. He was found to have been legally sane at the time of the offenses, and the penalty on the murder count was fixed at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant contends that the death penalty violates the California constitutional provision forbidding cruel or unusual punishments. (Cal. Const., art. I, § 6.) We so held in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], and must therefore modify the judgment herein to provide for life imprisonment. As so modified it must be affirmed, however, since defendant's remaining contentions—relating principally to the validity of his waiver of trial by jury and the effectiveness of his representation by counsel—are without support in the record.

Defendant was a resident of a trailer court in Modesto. At 10 p.m. on August 23, 1967, he entered a washroom and stabbed Marion Metzler, a fellow resident, with a weapon resembling a hunting knife. Metzler protested, and defendant cursed him and stabbed him a second time. At trial, Metzler testified that the attack was unprovoked; defendant took the stand and admitted the stabbings, but sought to justify his conduct on the ground he believed Metzler was sexually molesting defendant's dog. On cross-examination, defendant testified that he intended to stab Metzler, that he knew what he was doing and knew it was wrong, but that "I stabbed a lot of people" and "If I been intending to kill him, I would know where to hit him to kill him"; he further admitted that after stabbing Metzler he threw his knife away, explaining that "I generally threw them away when I get through using them."[1]

---

[1]Defendant's predilection for using a knife to settle grievances is illustrated by the following dialogue:

"Q [district attorney]. How many people have you stuck? A. I couldn't tell you. I don't remember how many.

"Q. You stuck Luther W. Reiner in 1957 in Arizona? A. I sure did or he stabbed himself.

"Q. And you stabbed Luther W. Reiner because you accused him of giving your wife a box of candy for Christmas? A. I didn't, no. He said he would loan me some money. He said he loaned her uncle some money. I was the one who let her uncle

Metzler sought medical aid from a neighbor, who telephoned the owner of the trailer court. The latter in turn called the police, and in a few minutes Deputy Sheriff Thornton arrived to investigate the incident. He was in full uniform and was driving a patrol car bearing the insignia of the sheriff's department and red emergency lights. Officer Thornton parked his car in the vicinity of defendant's trailer, leaving the lights and radio on. As he turned the corner of the trailer to approach the door, a shot rang out and the officer fell to the ground. Eyewitnesses testified that he did not take his gun from its holster until that moment. A volley of further shots was then exchanged, in the course of which the officer was killed.

After the shooting stopped, Charles Butler, another resident of the trailer court, approached the scene and found defendant lying wounded some six feet from Officer Thornton's body. Defendant reached towards the officer's revolver and said, "You're next, you son-of-a-bitch," but fell back when he was warned not to touch it. Butler asked what he had done, and defendant replied: "What the goddam hell do you think I have been done? I have just shot the shit out of him." Shortly thereafter other police officers arrived and defendant volunteered additional remarks, such as "I just bought that gun today for $50, and I sure got my money's worth," "I finally got myself a cop," and "Why don't you bastards let me get up from here and I'll do it again."[2]

An autopsy of Officer Thornton's body revealed four separate entry wounds caused by gunshot. From the nature of the wounds, the location

---

have the money, he didn't have the seventeen and a half. . . . He then went and said he lent me and George seventeen fifty apiece. He didn't do no such thing.

"Q. Who else have you stabbed? A. I forget the names.

"Q. What's that? A. I forget, but you might make me remember.

"Q. I'll try to jog your memory a little bit. A. All right. You jog it and see if I remember it. . . .

"MR. WOLFE [district attorney]: Q. All right. You also stabbed a man by the name of George Wells on January 1st, 1961, did you not, in Fresno? A. No, I didn't stab him.

"Q. You used some sort of sharp instrument? A. I cut him up some but I didn't stab him.

"Q. You make a distinction in your mind about cutting and stabbing? A. Cutting up and stabbing is two different things.

"Q. Did you use a knife? A. Yes, I used a knife on him.

"Q. Was Mr. Wells messing with your dog? A. No. He hit me with a quart bottle of Hill and Hill."

[2]There was other testimony indicative of defendant's attitude towards police. Six months earlier Deputy Sheriff Lyman went to defendant's trailer, when it was parked in a different community, to arrest him on a charge of armed robbery. Defendant kicked the officer in the stomach, retreated into his trailer, and announced that any policeman who tried to come in and get him would not leave alive. When defendant was finally subdued with the assistance of other officers, he said, "I didn't get you guys this time, but I will the next time."

and appearance of the spent bullets, and the number of empty cartridges in defendant's gun, the trier of fact could reasonably have inferred that after shooting Officer Thornton twice—once in the chest at a point-blank range of two to six inches—defendant then shot him twice more with the officer's own .357 Magnum revolver, once in the face and once in the hip.

Defendant presented a theory of self-defense and mistaken identity. He testified that after he stabbed Metzler, the latter threatened to kill him; that he, defendant, returned to his trailer, armed himself with his gun, and sat down to wait; that after a while he heard footsteps approaching and "thought maybe it might be Marvin [Metzler]"; that defendant rose to his feet, and "some man" came around the corner of the trailer carrying a gun; that the man fired at him first, and he simply returned the fire. Defendant asserted he could not see who his alleged assailant was, but acknowledged "It was pretty light" at the scene and he and the other man were face to face and only four feet apart when the shooting began. Defendant said he could not recall having fired additional shots after Officer Thornton fell, or having picked up the latter's gun and used it on the officer.

■ Defendant first contends that because of his mental condition his waiver of the right to trial by jury should not have been accepted. The record, however, supports the trial court's determination that at the time defendant waived a jury he was fully competent to do so.

The crimes were committed, and defendant was arrested, on August 23, 1967. On September 21, 1967, upon motion by counsel, the court declared a doubt as to defendant's then sanity, suspended the proceedings, and appointed two alienists to examine his capacity to stand trial. (Pen. Code, § 1368.) On October 5, 1967, the alienists reported that defendant was incapable at that time of assisting counsel in his defense; the court so found, and committed him to Atascadero State Hospital for care and treatment. Eight months later, on June 10, 1968, the hospital authorities certified that defendant had recovered his sanity. It was the opinion of the superintendent and staff that defendant was then able to understand the nature of the charges against him, and could cooperate rationally with counsel. Defendant was accordingly returned to court and arraigned on the indictment. He entered pleas of not guilty and not guilty by reason of insanity, and two further alienists were appointed to examine him under the latter plea. (Pen. Code, § 1027.) Although concluding that defendant had been insane at the time of committing the offenses, each doctor found him to be presently competent to assist counsel in the conduct of his defense.

Defendant and his counsel thereafter moved to waive jury trial. The record reflects the remarkable care exercised by the trial judge in satisfying

himself that defendant fully understood the nature and consequences of his proposed course of action, and that any waiver he might make would be both knowing and intelligent. By a detailed series of questions and explanations, the judge established that defendant had discussed the matter at length with his two attorneys; that he knew he had the right to have the case tried by 12 jurors; that he understood the charges against him and the pleas he had entered; that he realized the same judge would determine the issues of guilt, sanity, and penalty; that he was aware of the punishments which could be imposed in this case, including the possibility of a death penalty; and that no promise of special treatment or leniency had been made to him in exchange for his waiver of a jury.

The case is controlled in this regard by *People* v. *Aikens* (1969) 70 Cal.2d 369, 376-377 [74 Cal.Rptr. 882, 450 P.2d 258], *People* v. *Lookadoo* (1967) 66 Cal.2d 307, 311-313 [57 Cal.Rptr. 608, 425 P.2d 208], and *People* v. *Monk* (1961) 56 Cal.2d 288, 298 [14 Cal.Rptr. 633, 363 P.2d 865]. In each of those cases the defendant had a limited education and a borderline intelligence, but was represented by counsel and benefited from a detailed examination by the trial court into the nature and consequences of a waiver of jury trial; in each, we held that the defendant was capable of making a knowing and intelligent waiver of that right, and had done so on the record before us. Here the record is to the same effect,[3] and we likewise sustain the ruling of the court below in accepting the waiver.

There is nothing to the contrary in two decisions cited by defendant. Although *Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444], held the Sixth Amendment guarantee of trial by jury applicable to the states through the Fourteenth Amendment, the high court expressly recognized the continued constitutional validity of a proper waiver of that right.[4] And while we observed in *In re Walker* (1969) 71

---

[3]Defendant in the present case left school at the age of 13 to help support his family. He was not, however, an inexperienced youth at the time of committing the offenses here charged: he was 47 years old, and had served in the army, held a variety of jobs, and had other brushes with the law. Although a defense psychiatrist testified at the sanity phase that defendant's IQ was 83, defense counsel advised the court that he disagreed with the witness and believed rather that defendant "is of average intelligence." Defendant's testimony at the trial was more than just coherent; it was both responsive and alert to point out minor misstatements by his questioners.

[4]"We would not assert, however, that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury. Thus *we hold no constitutional doubts about the practices,* common in both federal and state courts, *of accepting waivers of jury trial* and prosecuting petty crimes without extending a right to jury trial." (Italics added; fns. omitted.) (*Duncan* v. *Louisiana* (1968) *supra,* 391 U.S. 145, 158 [20 L.Ed.2d 491, 501].)

Cal.2d 54, 57 [77 Cal.Rptr. 16, 453 P.2d 456], that the necessary showing of capacity to waive "is even more difficult when the person purporting to make the waiver is in an altered physiological or psychological state,"[5] we did not say that an adequate showing can never be made; rather, we admonished that a waiver by such a person "must be carefully scrutinized to determine that the person making it had the physical and emotional capacity to do so under all the circumstances of the case." We adhere to that standard; tested by its terms, however, the waiver in the case at bar clearly passes muster.

■ Nevertheless, defendant urges this court to rule as a matter of law that every defendant who has pleaded not guilty by reason of insanity "is conclusively presumed to lack the capacity to waive" his right to jury trial. There is no basis for such a novel presumption. The mere entry of a plea of insanity—which is far more often made than sustained—in no way establishes the fact of mental impairment. And even if the defendant was legally insane at the time of the offense, it does not necessarily follow that at the time of trial he still lacks the capacity to make a valid waiver of jury trial. Indeed, this is the very distinction embodied in the separate proceedings to inquire into (1) the defendant's sanity at the time of the offense (Pen. Code, § § 1026-1027) and (2) his present ability to stand trial (Pen. Code, § § 1367-1372). ■ As we recently recognized in *People* v. *Coogler* (1969) 71 Cal.2d 153, 168, fn. 7 [77 Cal.Rptr. 790, 454 P.2d 686], "The factors which may tend to establish a defendant's disability under section 1367, forbidding the trial of a person while insane, do not necessarily coincide with those which would tend to establish that he was insane under the M'Naughton test at the time he committed the acts for which he is being tried."

Defendant also contends that his counsel was misled into joining in the jury waiver by the court's mention of the medical reports theretofore filed.[6] The court thereby tacitly invited counsel, defendant argues, to assume that in conducting the sanity phase it would consider only the reports already on file and would resolve the issue in accordance with the recommendations contained in those reports, i.e., by finding defendant to be insane. The court's remark, however, may not reasonably be interpreted in the manner suggested. Taken in context, it appears the question

---

[5]In *Walker* an active narcotics addict purported to waive every procedural right provided by the civil commitment statute. (Welf. & Inst. Code, § 3100 et seq.)

[6]The reference is to the court's inquiry of counsel, "And you have also, prior to this time, investigated the facts and *the various reports in the matter* and as a result of the combination of that, you have spent some time discussing it with him and this is the conclusion that you, Mr. Hancock and Mr. Miller have come to?" (Italics added.)

was intended simply to satisfy the court that counsel had fully acquainted themselves with all aspects of the case before advising defendant on the important matter of waiver. Nothing the court said could have foreclosed it under the relevant statutes from thereafter appointing, as it did, an additional alienist to examine defendant on the insanity plea. (Pen. Code, § 1027 ["the court . . . may select and appoint three alienists . . . to examine the defendant"]; Evid. Code, § 730 [an expert may be appointed, when deemed necessary, "at any time . . . during the trial"].)[7] And contrary to defendant's claimed inference of a promise to find him insane, the trial court made repeated efforts to ensure that no party to the case was harboring an expectation that in exchange for a waiver the court would rule in any particular way.

Relying on *People* v. *McDowell* (1968) 69 Cal.2d 737 [73 Cal.Rptr. 1, 447 P.2d 97], defendant next contends the trial was reduced to "a farce and a sham" within the meaning of *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487], because his counsel did not interpose the defense of diminished responsibility. *McDowell*, however, does not stand for the proposition that a defense counsel in a criminal case will be deemed constitutionally ineffective every time he is in possession of psychiatric evidence bearing on his client's condition at the time of the crime but does not introduce it in the guilt phase. The issue is not so simple.

From a review of the cases, there appear to be three principal reasons why a defense counsel might not introduce evidence of diminished capacity at the guilt phase:

1. In some cases counsel did not know the *facts,* i.e., that diminished capacity evidence existed or could be developed by proper trial preparation. That was the situation in *Brubaker* v. *Dickson* (9th Cir. 1962) 310 F.2d 30, 39, in which counsel was aware of defendant's history of head injuries and heavy drinking, but failed to take reasonable steps to learn of his organic brain damage, hypersensitivity to alcohol, and proneness to seizures. The appellate court ordered post-conviction relief on the ground "that trial counsel failed to prepare, and that appellant's defense was withheld not through deliberate though faulty judgment, but in default of knowledge that reasonable inquiry would have produced, and hence in default of any judgment at all." (See also *In re Saunders* (1970) 2 Cal.3d 1033, 1048-1049 [88 Cal.Rptr. 633, 472 P.2d 921].)

In the case at bar, however, defendant does not claim his trial counsel

---

[7] The psychiatrist called as the court's expert witness gave as his opinion that at the time of committing the crimes charged defendant was legally sane under the M'Naughton test.

was ignorant of the facts bearing on his mental condition. No less than four physicians examined defendant prior to trial. Their reports recited in detail defendant's psychiatric history and diagnosed his condition as a form of schizophrenia. These reports were on file and available to trial counsel, and the latter entered a plea of not guilty by reason of insanity on defendant's behalf.

2. In other cases counsel knew the existence of facts tending to show diminished capacity but did not know the *law,* i.e., that such evidence is admissible at the guilt phase. That was the situation in *People* v. *McDowell* (1968) *supra,* 69 Cal.2d 737, as demonstrated on the record by counsel's frequent remarks and tactics to the effect that he was "foreclosed" from introducing such evidence at the guilt phase. We concluded that counsel in *McDowell* had refrained from raising the issue of diminished responsibility "not as an informed, tactical decision, but because he mistakenly believed the law prohibited him from inquiring into other aspects of defendant's mental abnormality during the guilt phase." (*Id.* at p. 744.) Here, by contrast, nothing said or done at the trial even suggests that counsel was unaware of or misunderstood the controlling cases on the defense of diminished capacity. There is therefore no basis whatever for accusing trial counsel of ignorance of the law; indeed, defendant's counsel on appeal conceded as much at oral argument.

3. In still other cases counsel knew both the facts of the defendant's mental state and the law of diminished capacity, but chose to withhold such evidence as a matter of tactics, usually until a later phase of the trial. In such cases we have uniformly declined the defendant's invitation to second-guess his counsel's decision, and have therefore rejected the claim of ineffective representation.

Thus in *People* v. *Goodridge* (1969) 70 Cal.2d 824 [76 Cal.Rptr. 421, 452 P.2d 637], the defendant murdered his victim and raped her dead body in circumstances which strongly indicated an impaired mental condition: he not only choked and "stomped" the victim, but by means of three successive knives he inflicted no less than 107 stab wounds on her body, 54 of which were in the abdomen. A psychiatrist, Dr. Meyers, examined the defendant and found "He had a mechanism within him that drove him to degrade, demean and desecrate women; whenever he saw a woman he had an impulse to rape or physically abuse her." Moreover, "The multiple stabbings caused Dr. Meyers to believe that some of defendant's acts were impulsive, in that after he took hold of his victim he could not stop what happened thereafter." (*Id.* at p. 834.)

Such evidence was at least as suggestive of a diminished capacity

defense as that here involved; yet defense counsel did not introduce the doctor's testimony—or any other diminished capacity evidence—at the guilt phase, and apparently did not urge the defense even on the basis of the unusual condition of the body. Indeed, contrary to the case at bar, the defense counsel in *Goodridge* did not put his client's mental condition directly in issue at any time, as he entered no plea of not guilty by reason of insanity. Rather, Dr. Meyers' testimony was finally introduced at the penalty phase.

The defendant's counsel on appeal, as here, contended that his trial counsel's failure to present a diminished capacity defense at the guilt phase—i.e., by calling Dr. Meyers to the stand—deprived him of constitutionally effective representation. We rejected the contention. We observed (at p. 838) that "There is nothing in defense counsel's conduct that shows either an 'unawareness of a rule of law basic to the case' [citation] or such lack of diligence or competence as to reduce the trial to a farce or sham." As to defense counsel's motives, we reasoned that "Counsel may well have believed that it would be unwise for the jury to hear at the guilt phase that Dr. Meyers characterized defendant as a misogynist who wished to 'degrade, demean and desecrate women,' in view of the fact that eight of the twelve jurors were women. [¶] The strategy of defense counsel in reserving Dr. Meyers' testimony until the penalty phase of the trial was doubtless to place before the jury the circumstances of defendant's background in mitigation of the punishment." (*Ibid.*)

Again, in *People* v. *Fain* (1969) 70 Cal.2d 588 [75 Cal.Rptr. 633, 451 P.2d 65], the defendant killed a young man without provocation and raped the two teenage girls whom the latter had been escorting home. The defense was alibi, and the jury found defendant guilty of first degree murder. His counsel on appeal contended that the defense should have been diminished capacity rather than alibi, and that trial counsel demonstrated constitutional incompetence in not adopting that course of action. In fact, pretrial psychiatric reports had revealed the possible presence of a diminished capacity defense.

We rejected the contention. We found it "noteworthy that defendant initially entered a plea of not guilty by reason of insanity; before trial, he withdrew the insanity plea in favor of a not guilty plea. . . . The fact that an insanity plea was entered suggests that a defense structured on defendant's inability to reach the requisite mental state did receive consideration, but counsel ultimately rejected dependence upon that defense." (*Id.* at p. 600.) The decision was tactical, and we applied the settled rule that "Under our adversary system, of course, the choice of strategy and

tactics remains committed to counsel's judgment." (*People* v. *McDowell* (1968) *supra,* 69 Cal.2d 737, 746.)[8]

■ In the present case defendant's counsel on appeal contended at length that a diminished capacity defense would not have been "inconsistent" with the self-defense theory advanced at trial, while the Attorney General expended a similar effort to depict that under the circumstances a diminished capacity defense would in effect have "impeached" the self-defense testimony. The arguments are often subtle and ingenious. The issue before us, however, is not whether such a defense would in fact have conflicted with the self-defense story defendant insisted on relating, but whether trial counsel would have demonstrated incompetence by acting upon a belief that the defenses would thus conflict. Under the circumstances, we are of the opinion that such a belief could reasonably have been entertained by trial counsel.[9] In a similar situation, the court in *Glover* (257 Cal.App.2d at p. 508) observed that "the apparent factual inconsistency of the two defenses of provocation and diminished capacity, while legally acceptable, obviously created a problem in jury persuasion."

In the alternative, trial counsel could well have believed that if he were to disclose his evidence of mental incapacity at the guilt phase, "it would lose much of its impact on the [trier of fact] during the insanity phase." (*People* v. *Glover, supra,* at p. 508 of 257 Cal.App.2d.) We touch here on a difficult tactical problem facing every defense counsel who possesses psychiatric evidence bearing on his client's condition at the time of the crime. Since the development of the *Wells-Gorshen* line of cases,[10] this

---

[8]For other decisions rejecting a claim of incompetence predicated on failure to interpose a diminished capacity defense, see *In re Hawley* (1967) 67 Cal.2d 824, 828-830 [63 Cal.Rptr. 831, 433 P.2d 919] [guilty plea to charge of murder held to be valid strategy, even though "counsel possessed substantial evidence supporting the possible defenses of insanity or diminished responsibility"]; *People* v. *Massie* (1967) 66 Cal.2d 899, 911 [59 Cal.Rptr. 733, 428 P.2d 869] [same]; and *People* v. *Glover* (1967) 257 Cal.App.2d 502, 508-509 [65 Cal.Rptr. 219] ["the failure of appellant's counsel to raise the diminished capacity defense during the guilt phase of the trial and to reserve it instead exclusively for the insanity phase of the trial, was in all probability a sound tactical decision and, as such, beyond the reach of *Ibarra*"].

[9]The defense psychiatric evidence related that defendant was a paranoid schizophrenic with delusions of persecution, principally, by members of the sheriff's office and other law enforcement authorities. There is an evident inconsistency between (1) defendant's testimony that he killed in self-defense because he thought it was Metzler coming to carry out his threat of retaliation, and (2) medical opinion that defendant killed because he believed the police were persecuting him; the latter implies, of course, that defendant thought the man approaching his trailer was a policeman and not Metzler.

[10]*People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]; for recent decisions on the defense, see *People* v. *McDowell* (1968) *supra,* 69 Cal.2d 737, 747, and cases cited.

evidence is usually admissible at both the guilt phase and the sanity phase. Counsel's dilemma is, therefore, at which phase should he introduce this evidence? In *People* v. *Coogler* (1969) *supra*, 71 Cal.2d 153, 169, we upheld the competency of counsel who chose to introduce such evidence at the guilt phase only: "His decision not to enter an insanity plea may have been based upon a fear that such a plea would prejudice his client's claim of diminished capacity; if the jury knew that an insanity hearing would follow in the event of defendant's conviction, it might treat summarily the psychiatric testimony as to whether defendant could form the requisite intent to commit the crimes charged." Even more certain than this conjecture, however, is that a trier of fact would tend to "treat summarily" such evidence if it were introduced at the sanity phase after the same trier had already rejected it at the guilt phase. It follows that when, as here, counsel concludes his client has a valid defense of not guilty by reason of insanity, it might be unwise for him to prematurely expose that evidence to the scrutiny of the trier of fact at the guilt phase.

It is no solution to this dilemma for us to engage in the perilous process of second-guessing whichever of the alternatives counsel chooses. It may be that this recurring strategic predicament can only be solved effectively by a means suggested with increasing frequency: i.e., that guilt and sanity be tried in a single, unitary proceeding. As we related in *McDowell* (69 Cal.2d at pp. 747-748, fn. 4), a number of distinguished authorities— including the Governor's Special Commissions on Insanity and Criminal Offenders—have called for the abolition of the present system of split guilt and sanity trials, finding it to be both unsound in its origins and unworkable in practice since the development of the law of diminished capacity. But as we also recognize in *McDowell* (*ibid.*), "Although some members of this court have growing doubts of the value of our present system of separate guilt and sanity trials, the decision to modify or abolish that system remains a legislative prerogative." The Legislature has not yet responded to our suggestion. Literature on the subject demonstrates, nevertheless, that if trial counsel in the case at bar was perplexed as to the appropriate phase in which to introduce his psychiatric evidence, he was not alone in his quandary.

Nothing is seen more clearly than with hindsight. The most that can be fairly said on this record, however, is that counsel's decision to delay introducing his evidence of defendant's mental state until the sanity phase was a debatable trial tactic. Yet as we reminded the bench and bar not long ago, even "debatable trial tactics" do not "constitute a deprivation of the effective assistance of counsel." (*People* v. *McGautha* (1969) 70 Cal.2d 770, 784 [76 Cal.Rptr. 434, 452 P.2d 650], affd. *sub nom. McGautha* v.

*California* (1971) 402 U.S. 183 [28 L.Ed.2d 711, 91 S.Ct. 1454].) When, as here, "there is no showing that counsel did not research the facts or the law, or that he was ignorant of a crucial defense" (*In re Hawley* (1967) *supra,* 67 Cal.2d 824, 829), and counsel makes a tactical choice to withhold certain evidence for a later stage of trial, sound policy reasons persuade us to defer to counsel's judgment in the matter.[11]

Defendant's remaining contentions may be briefly considered. His claim that a criminal defendant's burden of proving insanity by a preponderance of the evidence conflicts with the presumption of innocence has been resolved against him by statute (Evid. Code, §§ 501, 522) and by case law (*People* v. *Daugherty* (1953) 40 Cal.2d 876, 900-901 [256 P.2d 911], and cases cited; *People* v. *Flanagan* (1969) 275 Cal.App.2d 966, 968 [80 Cal.Rptr. 408]; cf. *Leland* v. *Oregon* (1952) 343 U.S. 790 [96 L.Ed. 1302, 72 S.Ct. 1002]). And there is no merit in his undocumented charge that representation by the public defender's office ipso facto denies a defendant due process and equal protection of the law. (*In re Hough* (1944) 24 Cal.2d 522, 528-529 [150 P.2d 448]; see also *People* v. *Hughes* (1961) 57 Cal.2d 89, 98-99 [17 Cal.Rptr. 617, 367 P.2d 33].)

The judgment, insofar as it provides for the penalty of death, is modified to provide a punishment of life imprisonment and as so modified is affirmed in all other respects.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I concur in the opinion, except I dissent from the modification of the death penalty to life imprisonment.

---

[11]Our ruling that the record does not support a charge of ineffectiveness of counsel is without prejudice, of course, to defendant's right to renew the contention by application for habeas corpus in an appropriate court, if he is so advised.