Filed 5/4/15  P. v. Ayobi CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074035 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F00488) |
| v. | |
| SHAJIA AYOBI, | |
| Defendant and Appellant. | |

A jury convicted defendant Shajia Ayobi of first degree murder and found, as a sentence enhancement, she was armed.  (Pen. Code, §§ 187, subd. (a), 12022, subd. (a)(1).)[1]  The jury did not find, as an additional sentence enhancement, that defendant personally used or fired the firearm.

---

[1]  Undesignated statutory references are to Penal Code.

Sentenced to 25 years to life in state prison for the murder, and an additional one year for the arming finding, defendant appeals. She contends her right to effective counsel and to a complete defense was violated by defense counsel's failure to request jury instructions regarding intimate partner battering. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after midnight on December 18, 2011, while sitting in the passenger seat of his van, Ghulam Ayobi[2] was shot in the head three times and died. At trial, defendant, who was Ghulam's wife and the driver of the van, testified she had hired her classmate, Jake Clark, to kill her husband and Clark had done so after hiding in the back seat while the couple visited with friends.[3] At trial, defendant relied principally on imperfect self-defense.

*Defendant's Traumatic History*

Defendant was born in 1966 in Afghanistan near the Pakistani border. She was one of 11 children. Between the ages of four and 14, defendant witnessed her father beat her mother on multiple occasions. When defendant was 12 years old, the Soviet Union invaded Afghanistan. During the occupation, defendant recalls a bombing of her school, seeing her neighbors butchered, and being personally assaulted by the Taliban.

At 17, defendant immigrated to California. Although defendant wished to attend college and medical school, her family forced her into an arranged marriage with her first husband, a marriage that included coerced abortions, physical abuse, and an eventual divorce.

---

[2] Because defendant and the victim share the same surname, we shall refer to the victim by his given name, Ghulam.

[3] In previous statements, defendant reported the shooting to be a carjacking and a CIA assassination.

2

*Living with Ghulam*

To mitigate the personal shame that her culture and family placed on divorce, defendant married Ghulam Ayobi after knowing him for only two hours. After a good first year of marriage, Ghulam became abusive. For more than 17 years Ghulam physically and emotionally abused defendant and their four children.

In 2010, Ghulam took a job in Louisiana and returned home only occasionally. After a visit that summer in which Ghulam threatened defendant with a gun, she purchased her own gun for protection. During this two-year period, defendant became more and more fearful Ghulam would harm her or their children. When away from home, he repeatedly made threatening phone calls to the family. When at home, his behaviors escalated including one incident in which he got mad and etched Farsi letters onto his body and another in which he attacked the family computer with an axe because his son, who was at the computer at the time, had been playing too many video games.

*Events Leading up to the Shooting*

Defendant testified that about two months before Ghulam's visit in December 2011, he became more secretive. Ghulam told defendant not to tell anyone he was coming and he would be arriving at any time with military personnel via helicopter. She became fearful and began preparing herself for something "tragic."

On December 15, 2011, the day before Ghulam's visit home, defendant solicited a classmate, Jake Clark, to kill Ghulam for $10,000.[4] Defendant and Clark met the next day; together they purchased a prepaid phone, and Clark told her to call when she was ready for him to kill Ghulam.

---

[4] Defendant told Clark that the intended victim was the brother-in-law of a friend of hers who had raped her friend's daughter. She never did disclose the actual intended victim.

At about 10:00 p.m. on December 16, Ghulam called from the airport, three hours earlier than expected. That night, shortly after going to bed, Ghulam got up and began searching the house. Defendant feared he would find a gun in the garage. Between 4:00 and 5:00 a.m., Ghulam roused the children and announced to them and defendant that "death can come at any time" and "death is coming. It's very close." He also talked to them about a prayer from the Koran he wanted to be buried with.

At about 5:00 p.m. on the evening of December 17, an hour before defendant and Ghulam were due for dinner at a friend's house, defendant received a phone call from Clark. She told Clark there was a 50/50 chance she would go through with it, gave him the address of where they would be, and described the van. She told him this was "not the final instruction for [him] to proceed." Clark told her to make sure the gun, along with a knife and a flashlight, was in the back of the van. Defendant did as instructed.

Ghulam insisted on wearing his old, faded army pants to the friend's dinner because the pants gave him pride; he added that he wanted to be buried in them. Throughout the evening, Ghulam was not himself; he appeared more serious than usual and did not joke with his friends as he normally would. At this point defendant called Clark and told him the plan was on.

**The Shooting**

Defendant went outside to unlock the van at about 9:30 or 10:00 p.m. She had previously left her gun, the knife, and the flashlight in the back of the van.

At about 11:45 p.m., defendant and Ghulam got into the van to head home. As defendant drove, she heard Clark's voice from the back seat tell her to get onto the freeway. Ghulam started to hand Clark his wallet, and then tried to tackle Clark. Defendant heard one gunshot, and then two more. She pulled over to the side of the road to let Clark out. Clark told her he had taken everything with him, and she should get back on the freeway and report the shooting as a carjacking. Defendant did so.

4

*Expert Testimony*

At trial, Rahn Minagawa, Ph.D., testified as an expert in clinical and forensic psychology, with experience and expertise in the areas of traumatic child abuse and domestic violence. He testified that individuals who have been exposed to multiple traumas throughout their life can develop a particular mood disorder called "complex trauma." Examples of the types of traumas that can lead to complex trauma include witnessing domestic violence between parents, witnessing war as a child, and physical or sexual abuse. Symptoms of complex trauma include distortions in thinking that make individuals interpret everything around them as a threat or potential for violence to occur. Complex trauma can result in poor decision making, hypervigilance, and dissociation.[5] After interviewing defendant and members of her family, Dr. Minagawa diagnosed defendant as having complex trauma disorder.[6] Dr. Minagawa was certain that the diagnosis was present when Ghulam was killed.

In addition to his testimony regarding complex trauma, Dr. Minagawa testified that it is common for victims of domestic abuse to stay with or return to their abusive partners—especially when there are children involved. He also testified that domestic violence is a socially acceptable expectation in some Middle Eastern cultures. While Dr. Minagawa testified regarding the effects of domestic abuse, he did not describe or provide a diagnosis of intimate partner battering or battered women's syndrome.

---

[5] "Hypervigilance" is a condition in which individuals have an automatic response to external sensations such as a combat veteran diving to the ground when a car backfires. "Dissociation" is when an individual feels like they have separated from their body in order to psychologically protect themselves from an event.

[6] Dr. Minagawa also diagnosed defendant with posttraumatic stress syndrome and major depressive disorder.

### *Defense Counsel's Theory of the Case*

Throughout his direct examination of defendant and Dr. Minagawa, and in his closing argument, defense counsel relied on a theory of complex trauma disorder. Counsel did not rely on intimate partner battering or battered women's syndrome as a separate defense. Instead, defense counsel *used the evidence of domestic violence, along with defendant's lifetime of traumatic experiences*—i.e., the evidence of complex trauma disorder in defendant—to develop *imperfect* self-defense. Further, in closing argument, counsel conceded that, based on the evidence presented, *perfect* self-defense was "a pretty big stretch in this case."

In line with the theory of complex trauma supporting imperfect self-defense, defense counsel stated in closing argument, "And there are some people, ladies and gentlemen, who actually experience this trauma. And they experience it not once, not twice, but over and over and over again. And those . . . people suffer from complex trauma disorder, just like [defendant] does. The defense is not speculating what was in [defendant's] mind. I'm telling you, showing you, giving you evidence of what was in her mind. Because what was in her mind is the only important issue here in this case." Defense counsel continued in closing, "Now, the law also recognizes that there are times when people in good faith believe something, but the rest of us wouldn't"; and defendant "had an actual belief [in her need to defend] because she was traumatized, . . . , because she suffered from complex trauma, [and] because her husband was an erratic brute . . . ."

## DISCUSSION

Defendant asserts defense counsel rendered ineffective assistance of counsel and an incomplete defense by failing to request jury instructions on the effects of intimate partner battering.

To establish ineffective assistance of counsel, defendant must demonstrate that counsel's performance fell below an objective standard of reasonable performance, and

6

that defendant suffered prejudice as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692 [80 L.Ed.2d 674, 693, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

## I. Defense Counsel's Failure to Request Jury Instructions Regarding Intimate Partner Battering Did Not Fall Below an Objective Standard of Reasonable Performance

The record does not specifically indicate why defense counsel chose to limit the defense theory to imperfect self-defense or to use the evidence of intimate partner battering as part of the complex trauma theory, as opposed to raising intimate partner battering as a defense on its own. However, the record does indicate that the decision was a tactical one. During the instructional conference, the trial court offered several jury instructions to defense counsel, including CALCRIM No. 851 ("Testimony on Intimate Partner Battering and Its Effects: Offered by the Defense"), and clarified for the record that defense counsel was not requesting these instructions for tactical reasons and counsel was not relying on them for the defense theory of the case.

Absent an explanation on the record for this tactical choice, we must, on appeal, find this choice did not fall below an objective standard of reasonableness if we can conceive of a reasonable explanation for it. (*People v. Pope* (1979) 23 Cal.3d 412, 426, disapproved on a different ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) Here, we can imagine several reasonable explanations for refraining from including intimate partner battering instructions: Perhaps counsel did not want the jury simply to focus on intimate partner battering, as defendant's traumatic condition encompassed more than just intimate partner battering; perhaps counsel did not want to confuse the jury with a redundant instruction; perhaps counsel felt it would cloud the actual belief/reasonable belief distinction involving the more plausible imperfect self-defense theory; perhaps counsel felt the expert testimony did not support a diagnosis of intimate partner beating. This "perilous process of second-guessing" (*People v. Miller*

7

(1972) 7 Cal.3d 562, 573 ) illustrates why, in situations like this, "a claim of ineffective assistance is more appropriately made in a petition for habeas corpus [where] there is an opportunity in an evidentiary hearing to have trial counsel fully describe" the reasons for his tactical choice. (*People v. Pope*, *supra*, 23 Cal.3d at p. 426.) On appeal, we need not speculate as to the actual reasons for this tactical choice any further than to demonstrate a satisfactory explanation exists. (*Ibid*.)

## II. Defense Counsel's Failure to Request Jury Instructions Regarding Intimate Partner Battering Did Not Prejudice the Defense

Even if defense counsel did not have a satisfactory reason for not requesting instructions on intimate partner battering and its effects, the omission of these instructions did not prejudice the defense.

Counsel's ineffectiveness becomes prejudicial when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694 [80 L.Ed.2d 674 at p. 698].)

### A. *Proposed Jury Instruction Is Redundant*

Before we get to the specific language of the instructions at issue, we note the following. The state-of-mind requirement for perfect self-defense is the defendant *actually, and reasonably, believes* she must defend herself or another from imminent danger of death or great bodily injury. (§197, subd. 3.) And the state-of-mind requirement for imperfect self-defense is the defendant *actually, but unreasonably, believes* she must defend herself or another from imminent danger of death or great bodily injury. (*People v. Randle* (2005) 35 Cal.4th 987, 994, disapproved on different grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

Defendant contends that defense counsel should have requested that the following jury instruction, drawn from CALCRIM No. 851, be provided:

"[1.] You have also heard testimony from Dr. Rahn Minagawa regarding the effect of intimate partner battering. [¶] . . . [¶] [2.] You may consider this evidence only in deciding whether the defendant actually believed that she needed to defend herself against an immediate threat of great bodily injury or death, and whether that belief was reasonable or unreasonable. [¶] [3. & 4.] *When deciding whether the defendant's belief was reasonable or unreasonable, consider all the circumstances as they were known by or appeared to the defendant. Also consider what conduct would appear to be necessary to a reasonable person in a similar situation with similar knowledge*." (Italics added.)

The first sentence of defendant's proposed instruction is clearly prefatory language stating the fact that Dr. Minagawa testified, including on intimate partner battering.[7] Presumably the jury was aware of this without the instruction.

The second sentence of the proposed instruction is a limiting instruction stating that Dr. Minagawa's testimony could be used only in deciding two aspects of defendant's state of mind: Actual belief; and reasonable belief. While the second sentence of the proposed instruction may have helped inform the jury that they could consider Dr. Minagawa's testimony in determining whether defendant actually believed or reasonably believed she needed to defend herself against an immediate threat, that information was provided elsewhere in the instructions given.

Specifically, the jury was instructed on imperfect self-defense (CALCRIM No. 571 (Jan. 2006 new) (Aug. 2012 rev.)), as pertinent:

---

[7] In fact, Dr. Minagawa did not testify specifically about the effect of intimate partner battering per se, but rather the effects of domestic violence on both the victims and the children of victims of this violence. Consequently, it is unclear whether this request is even on point. For the sake of analysis, we assume intimate partner battering is synonymous with domestic violence in this instance.

"In evaluating the defendant's beliefs [that she or someone else was in imminent danger of being killed or suffering great bodily injury and that immediate use of deadly force was necessary to defend against the danger], consider all the circumstances as they were known and appeared to the defendant;

"If you find that Ghulam Ayobi threatened or harmed the defendant or others in the past, you may consider that information in evaluating the defendant's beliefs; [and]

"If you find that the defendant knew that Ghulam Ayobi had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs."

And the jury was instructed on perfect self-defense (CALCRIM No. 505), as pertinent:

"*When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed . . .*"; [¶] . . . [¶] [(Italics added.)]

"If you find that Ghulam Ayobi threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable;

"If you find that the defendant knew that Ghulam Ayobi had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable; and

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person."

10

Finally, the third and fourth sentences of *the proposed jury instruction* (CALCRIM No. 851) were also provided for in the perfect self-defense instructions just quoted. (See italics added to CALCRIM No. 505, *supra*.)

These redundancies inform the analysis that follows.

**B.** ***There Is Not a Reasonable Probability That the Proposed Jury Instruction Would Have Resulted in a Finding of Perfect Self-defense***

As noted, the state-of-mind requirement for perfect self-defense is that the defendant actually, and reasonably, believes she must defend herself or another from imminent danger of death or great bodily injury. (§197, subd. 3.)

Defendant suggests that the proposed jury instruction, CALCRIM No. 851, would have convinced the jury that her abusive relationship made her alleged actual belief that she was in imminent danger more reasonable. However, the jury, through their verdict, found defendant did not have an *actual* belief that she was in imminent danger; if they had, they would have applied imperfect self-defense and returned a verdict of manslaughter regardless of reasonableness. (CALCRIM No. 571.) Using CALCRIM No. 851 to instruct the jury on when to find her actual beliefs reasonable does not apply here.

Moreover, as discussed above, the jury had instructions explicitly allowing them to consider the abusive relationship. The jury was instructed with regard to reasonable belief, "When deciding whether the defendant's beliefs were reasonable . . . , [i]f you find that Ghulam Ayobi threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable." (CALCRIM No. 505.)

Further, defendant misrepresents CALCRIM No. 851. The instruction does not tell the jury they must consider testimony regarding intimate partner battering in forming their verdict; it tells the jury they must limit their consideration of this testimony to the

11

reasonableness calculus instructed in the perfect self-defense instruction, which was provided here.  (Compare CALCRIM No. 851 with CALCRIM No. 505.)

The instructions provided to the jury supplied ample opportunity for them to consider the domestic abuse, along with defendant's overall traumatic history, in their consideration of perfect self-defense.  There is not a reasonable probability the limiting instructions in CALCRIM No. 851 would have resulted in a different finding.

## C.  There Is Not a Reasonable Probability That the Proposed Jury Instruction Would Have Resulted in a Finding of Imperfect Self-defense

As noted, the state-of-mind requirement for imperfect self-defense is the defendant actually, but unreasonably, believes she must defend herself or another from imminent danger of death or great bodily injury.  (*People v. Randle*, *supra*, 35 Cal.4th at p. 994.)

As discussed above, the jury had instructions explicitly allowing them to consider the abusive relationship in their decision as to whether or not defendant had an actual belief of imminent danger of death or great bodily injury.  The instructions provided to the jury supplied ample opportunity for them to consider the domestic abuse in their consideration of imperfect self-defense.  There is not a reasonable probability the limiting instructions in CALCRIM No. 851 would have resulted in a different finding.

## D.  Expert Testimony Regarding Domestic Violence and Its Effects on the Mind Was Admitted

Defendant spends a good portion of her opening brief discussing "battered women's syndrome" and details the importance of testimony regarding domestic violence in helping a jury understand the potential actual and reasonable beliefs of a victim of domestic violence.  Defendant implies this evidence was not offered in this case, citing cases that were overturned because expert testimony on this issue was ruled inadmissible or allowed only for limited purposes.  (See *People v. Aris* (1989) 215 Cal.App.3d 1178, 1197, overruled on another ground in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089; see also *State v. Gallegos* (1986) 104 N.M. 247 [719 P.2d 1268].)  Here, extensive expert

12

testimony was allowed regarding the effects of domestic violence on defendant's actual and reasonable belief. Defendant's cited cases are not on point and do not apply.

Defendant conflates the prejudicial error that exists when this testimony is not allowed with the reasonable trial tactic defense counsel used here in relying on the defense of imperfect self-defense. Here, expert testimony regarding domestic violence and complex trauma was admitted. During the majority of the last day of testimony, the jury listened to expert testimony regarding domestic violence and other factors that may have affected defendant's state of mind. There is not a reasonable probability that complimenting the live witness testimony with the limiting instructions in CALCRIM No. 851 would have resulted in a different finding.

### E. Response to Related Arguments Made by Defendant

Finally, defendant relatedly asserts that defense counsel failed to adequately link Battered Women's Syndrome (BWS) to Posttraumatic Stress Disorder (PTSD), and notes the prosecution introduced evidence of behaviors that could not be reconciled with a diagnosis of PTSD, but which the jury would have understood with instructions regarding BWS.

First, defendant suggests her pattern of returning to Ghulam following abusive episodes would have been better explained with testimony regarding BWS than with testimony regarding PTSD. But the defense did present that testimony, albeit without diagnosis of BWS, as a symptom of her domestic abuse.

Second, defendant suggests that someone suffering from BWS is particularly aware of "subtle signals" that may indicate an imminent beating. Here, no evidence was offered that defendant sensed any subtle signals of an imminent beating on the night of the shooting. In fact, quite the opposite—defendant's testimony regarding the day and evening of the shooting is replete with references to show Ghulam acted in an overtly unfamiliar manner. Moreover, Dr. Minagawa had already testified that one of the

13

symptoms of complex trauma is a distortion of thinking that makes the subject consider "everything around [them] as either a threat or potential for violence." It is certainly reasonable that a jury may have a difficult time reconciling "subtle signals" with this sort of cognitive disorder.

On the appellate record before us, defense counsel did not perform ineffectively or present an incomplete defense.

## DISPOSITION

The judgment is affirmed.


                                                            BUTZ           , J.


We concur:


      BLEASE       , Acting P. J.


      MAURO       , J.