OPINION *Page 2 
{¶ 1} Defendant-appellant, Ian James Templeton, appeals his conviction and sentence in the Richland County Court of Common Pleas on one count of aggravated burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND THE CASE {¶ 2} On the night of March 5, 2005, nineteen year old Ryan Hughett lived with his mother at 197 Hampton Road in Lexington Ohio. Hughett was addicted to crack cocaine, and on that night he contacted Alyssa Shoemaker to buy drugs. Shoemaker went to Hughett's house and sold him an amount of crack cocaine for approximately $40.00 or $50.00. After she left, Hughett looked at the amount of drugs that he received and realized that Shoemaker had cheated him.
 {¶ 3} He then called Shoemaker to make a second drug purchase. Shoemaker once again drove to Hughett's home and picked him up. They drove several streets over from Hughett's house before making the deal. When Shoemaker showed him the drugs, Hughett grabbed them out of her had without paying for them, and fled through the neighborhood. Shoemaker drove to his house and pounded on the door for several minutes; however, Hughett would not answer.
 {¶ 4} Grant Weixel testified that he was home from college on spring break. On March 5, 2005 he met up with Jason Reed and Chad Wyrick, two friends from high school. The three eventually went to a bar called Nellie's Hideaway, where they met the appellant and Alyssa Shoemaker. *Page 3 
 {¶ 5} After having a few drinks and snorting some cocaine, the five individuals decided to go to the home of Nino Sorrenti. At Sorrenti's house, Weixel testified that he, the appellant, Jesse Reed and Alyssa Shoemaker continued to drink and use cocaine. Reed, Shoemaker, and the appellant were complaining that a kid owed them money, and they wanted to collect it. The conversation progressed to the point were the three were adamant about getting the money that night. He indicated that the appellant was participating in the conversation concerning beating up the person who had stolen the drugs. Weixel testified that he could tell the appellant was angry about the situation and was upset that he was owed money. Reed, Shoemaker, and the appellant eventually decided to go to the individual's home in Lexington to collect the money. Weixel testified that he and Chad Wyrick decided to drive them to Lexington. He indicated that they left some time around 3:00 a.m. in Wyrick's Rav4 sport utility vehicle. Weixel testified that Reed gave directions to the person's house, and they parked along the curb. Reed told them to leave the car running because they would be right back. Reed and the appellant then got out of the car and approached the house.
 {¶ 6} Weixel testified that he saw Jesse Reed and the appellant knock on the door before both raised their legs and kicked in the door. At that point, Weixel and Chad Wyrick got out of the car to see what had happened. At that point they saw a person come running out of the house. Wyrick chased him down and tackled him before he recognized him as Levi Drye. Weixel stated that he, Wyrick, and Drye were walking back toward the house when Shoemaker began yelling from the car. He then saw and Reed and the appellant run out of the house. *Page 4 
 {¶ 7} Weixel testified that Alyssa Shoemaker got into the driver's seat of the car, and was yelling that they needed to leave. Everyone got into the car, which had been running without headlights. Weixel indicated that Shoemaker drove away erratically. The occupants of the vehicle were concerned with her driving, and eventually she pulled over and let Chad Wyrick drive. They then went back to Nino Sorrenti's house.
 {¶ 8} On the way, there was some discussion and bragging about what had occurred. Weixel testified that Jesse Reed showed him his hand, which was swollen and had blood on it. Reed indicated that he hit the person while inside the house. The appellant told the group that he had kicked the victim twice, once when he was on the ground and a second time when he tried to get away. Weixel stated that the appellant never indicated that he tried to help the victim, or tried to prevent Jesse Reed from attacking him. According to Weixel, the appellant also did not express surprise at what happened to the victim.
 {¶ 9} Chad Wyrick's testimony regarding the events surrounding the aggravated burglary is nearly identical to that of Grant Weixel. He indicated that he was with Weixel and Jesse Reed at Nellie's Hideaway, when they ran into Alyssa Shoemaker and the appellant. Wyrick testified that after leaving the bar, the five of them went to Nino Sorrenti's house. At Sorrenti's house, they continued drinking and using cocaine.
 {¶ 10} Wyrick testified that Jesse Reed was on the phone for a period of time. After Reed got off the phone, Wyrick heard Reed, Shoemaker, and the appellant having a discussion about some kid who owed them money. Wyrick testified that when he was preparing to leave, Reed asked if he would drive them over to the kid's house to pick up some money. He, the appellant, Grant Weixel, Alyssa Shoemaker and Jesse Reed, all *Page 5 
got into his Rav4 and he drove to the kid's house. Wyrick testified that he pulled onto the street, and they told him were to park. Reed and the appellant got out of the car and proceeded to walk up to the door. Wyrick indicated that he saw Jesse Reed knock; then he heard a loud bang and the door was open. He then saw Reed and the appellant enter the house.
 {¶ 11} Shortly after Jesse Reed and the appellant entered the house, they saw someone run out of the house. Wyrick testified that he and Grant Weixel got out of the car, and he yelled at the person to stop. When the person continued to run, he ran after him and tackled him. After he tackled the person, he recognized him as Levi Drye, and asked him what was going on. Wyrick indicated that after a minute or two, he, Weixel and Drye, walked back toward the house. At that point, Jesse Reed and the appellant ran out of the house.
 {¶ 12} Wyrick testified that Alyssa Shoemaker was in the driver's seat of his car. Once everyone was in the car, Shoemaker was in a panic, asking what happened. Wyrick indicated that she was driving frantically when they left the scene, and he was concerned because he did not give her permission to drive his car. Wyrick stated that Shoemaker had the keys because he had left them in the ignition.
 {¶ 13} During the car ride back to Nino Sorrenti's house, Wyrick testified that there was some discussion about what happened. He stated that both Jesse Reed and the appellant indicated that they beat the kid up. Wyrick indicated that the appellant complained of his jaw hurting and said that the kid might have hit him. He testified that neither Reed, nor the appellant indicated that they did not intend to hit the kid. Wyrick *Page 6 
also testified that there was no discussion that the appellant was trying to protect the victim from Reed.
 {¶ 14} At Nino Sorrenti's house, the five continued to discuss the events of that night. Wyrick indicated that when Sorrenti and Matthew Pursley asked what happened, the appellant made statements regarding his participation in the beating of Ryan Hughett. Jesse Reed also made similar statements about his involvement in response to their questions.
 {¶ 15} Alyssa Shoemaker testified that after leaving Hughett's house, she met several of her friends and they eventually went to Nellie's Hideaway. She indicated at the bar, she was drinking and doing cocaine. At some point, she ran into the appellant.
 {¶ 16} Shoemaker testified that she told the appellant that Ryan Hughett ripped her off in a drug deal. The appellant then called Jesse Reed and told him about what Shoemaker said had happened. Shoemaker indicated that the appellant told her he was calling Reed because Hughett had previously ripped Reed off in a drug deal.
 {¶ 17} After the bar closed, Shoemaker testified that she and the appellant rode with Chad Wyrick and Grant Weixel over to Nino Sorrenti's house. At Sorrenti's house, she told Jesse Reed that Ryan Hughett had stolen cocaine from her. This conversation centered on going to Hughett's house and beating him up.
 {¶ 18} Shoemaker testified that after doing cocaine and talking about beating Hughett up, she, Chad Wyrick, Jesse Reed, Grant Weixel, and the appellant got into the car and drove to Hughett's house. She indicated Wyrick was driving and that either she or Reed gave him directions to Hughett's house. Shoemaker testified that while they *Page 7 
were in the car, Reed stated that if Hughett did not come to the door, he would "go in and whip his ass."
 {¶ 19} Once they reached Hughett's house, they parked the car on the street and left the keys in the ignition. Shoemaker testified that she stayed in the vehicle because she knew whatever was going to happen "wasn't going to be very good." She indicated that the four guys went to the front door; then she saw the door swing open and Levi Drye ran out. Shoemaker testified that she saw Chad, Wyrick and Grant Weixel chase Drye into the front yard; however, she did not see Jesse Reed and the appellant at that point.
 {¶ 20} Shoemaker testified that she jumped into the front seat of the car after she saw Wyrick tackle Levi Drye because she knew something bad was going on. Shortly thereafter, the four men ran to the car. Shoemaker stated that she drove away frantically and recklessly. At one point, Chad Wyrick told her to pull over and let him drive.
 {¶ 21} While they were driving back to Nino Sorrenti's house, Shoemaker asked Jesse Reed if he got any money. Reed indicated that he did not get any money; however, he checked Ryan Hughett's pockets to see if he had any money. Shoemaker indicated that there was also some discussion regarding what took place inside the house. She testified that Jesse Reed said that when Hughett came at him with a plastic pipe, he grabbed the pipe out of his hands and threw him down on the bed. Reed also indicated that the appellant held Hughett down while Reed hit him with the pipe a couple of times. Shoemaker testified that the appellant agreed with Jesse Reed's version of events. *Page 8 
 {¶ 22} When they got back to Nino Sorrenti's house, Shoemaker indicated that Jesse Reed and the appellant told Sorrenti and Matthew Pursely what had happened. She stated that they told the same story about the scuffle inside the house that they told in the car. According to Shoemaker, both Jesse Reed and the appellant participated in telling the story.
 {¶ 23} Jesse Reed, who had already been convicted for his participation in the crime, testified that on the evening of March 5, 2005, he was drinking at his friend Nino Sorrenti's house. At some point that evening, he received a telephone call from Alyssa Shoemaker, who indicated that she had been robbed by Ryan Hughett.
 {¶ 24} He testified that Shoemaker called him because she knew that Hughett had done the same thing to him. Later that night, the appellant, Alyssa Shoemaker, Chad Wyrick, and Grant Weixel arrived at Nino Sorrenti's house. Reed testified that Shoemaker was talking about going to Ryan Hughett's house and was trying to "amp everybody up to go with her." He stated that at first she just wanted to get him to come outside and give the money back. However, as the conversation progressed Shoemaker wanted to break out his windows. She then decided they should kick in the door and beat up Hughett. Although Chad Wyrick voiced some reluctance, they eventually decided to go along. Reed testified that sometime after midnight, all five of them got into Wyrick's Rav4 and drove to Hughett's house in Lexington.
 {¶ 25} Reed indicated that they parked the car on the street in front of Ryan Hughett's house, and he and the appellant got out of the car. Reed knocked on the door, and there was no answer. After he saw someone peek out the front window, Reed *Page 9 
testified that he and the appellant decided to kick in the door. They both kicked on the count of three and the door opened.
 {¶ 26} Reed testified that as soon as the door opened, Ryan Hughett ran into the hallway. The appellant chased him while Reed checked to see if anyone was in the kitchen. Reed indicated that when he ran back to the bedroom, he saw Hughett on all fours while the Appellant was punching him. He heard the appellant say "you like robbing people?" several times to Hughett. Reed stated that he assisted the appellant by striking Hughett with a pipe that he found in the bedroom, as well as with his fists. He indicated that he struck Hughett with the pipe approximately three to five times while the appellant was either holding him down on the bed or hitting him. When asked if the appellant ever indicated they should stop what they were doing, or tried to prevent him from harming the victim, Reed responded that he did not.
 {¶ 27} Reed testified that the assault lasted five or ten minutes before he and the appellant decided that they needed to "get out of there." Reed testified that as they ran out the front door, they saw Chad Wyrick and Grant Weixel with the guy Reed saw run out of the house. He indicated that Wyrick and Weixel seemed scared, and asked him what happened. At that point, they all got back into the car and drove away. Reed stated that he knew they had to leave because they had "stirred up enough trouble."
 {¶ 28} Reed indicated that when they got back into the car, Alyssa Shoemaker was in the driver's seat. She drove away very recklessly, and they kept telling her to slow down so they did not get pulled over for speeding. Eventually, they persuaded her to pull over, and someone else drove the rest of the way to Nino Sorrenti's house. Reed *Page 10 
testified that they thought it would be safe to go back there because Sorrenti's parents were gone.
 {¶ 29} Reed indicated that when they returned to Nino Sorrenti's house, they explained what happened to Sorrenti and Matthew Pursely. He stated that they were worried that Hughett would call the police. He told Sorrenti and Pursley that he and the appellant went up to the door, and kicked it in. He also told them that they did not get any money, but that they beat Hughett up. Reed testified that the appellant participated in telling the story.
 {¶ 30} Nino Sorrenti and Matthew Pursley heard the discussions both before and after the crime. Sorrenti and Pursley both testified that on the evening of March 5, 2005, they were in Sorrenti's basement playing video games and drinking. Sometime that night, their friend Jesse Reed came over. After midnight, the appellant, Alyssa Shoemaker, Chad Wyrick, and Grant Weixel also showed up. Sorrenti testified that he told Reed that he did not want all of those people at his house; however, they stayed and hung out in the bar area of his basement.
 {¶ 31} While they were talking and drinking, Sorrenti indicated that the topic of money came up several times. He did not know the details of the conversation, but it sounded like the money was owed to Alyssa Shoemaker because she was getting emotional and was yelling about somebody stealing something. Sorrenti testified that Jesse Reed and the appellant also participated in the conversation. According to Sorrenti, the appellant was also complaining about the money that was owed to Shoemaker. At one point during the conversation, someone said that if they saw *Page 11 
Hughett, they would "fuck him up." Sorrenti testified that cocaine was also mentioned when Shoemaker, Reed, and the appellant were discussing money.
 {¶ 32} Matthew Pursley also testified that he overheard Alyssa Shoemaker talking about an incident in which someone stole money from her. She also mentioned that she had cocaine. According to Pursley, Jesse Reed mentioned that the person who took the cocaine lived in Lexington. Based on the portions of conversation that he heard, Pursley learned that the person they were discussing owed Reed money, and had taken money from Shoemaker. He indicated that they were talking about going over to the person's house and beating him up to get what they wanted. Pursley testified that the appellant also participated in this conversation with Shoemaker and Reed. The appellant was going along with Reed's idea to go to the guy's house and beat him up.
 {¶ 33} Both Nino Sorrenti and Matthew Pursley testified that sometime between 3:30 and 4:30 in the morning, the group decided to leave Sorrenti's house and go to Lexington. They indicated that the appellant, Alyssa Shoemaker, Jesse Reed, Chad Wyrick, and Grant Weixel all left in Wyrick's sport utility vehicle. Sorrenti testified that when they left, he told them not to come back; however, he told Jesse Reed that he could come back alone if it was not too late.
 {¶ 34} Sorrenti indicated that they were returned approximately thirty to forty-five minutes later. At first, he only saw Jesse Reed at the door; but, when he let him, in the appellant, Shoemaker, Wyrick and Weixel also came inside. Sorrenti testified that when they returned, "you could feel some adrenaline going on with them." He indicated that Jesse Reed walked in with a grin on his face. Sorrenti noticed some residue on the appellant's mouth which the appellant initially said was Chap Stick, but later admitted *Page 12 
was blood. Sorrenti testified that the appellant mentioned something about getting punched, and said that Reed must have hit him. In response, Reed said "my bad" and laughed.
 {¶ 35} Pursley testified that when he asked what happened down in Lexington, Reed and the appellant said that they went in the door and assaulted the kid. The appellant said that he hit and kicked the guy, and demonstrated by making swinging motions. Nino Sorrenti also testified that the appellant reenacted the fight, swinging his arms around like he was hitting someone. Both Pursley and Sorrenti indicated that based on the story they heard and the appellant's actions, there was nothing that would lead them to believe that he had tried to protect the victim.
 {¶ 36} Dian Spayde, the next door neighbor of Ryan Hughett, testified that in the early morning hours of March 6, 2005 she woke up because she heard a car stop in front of her house. She also heard car doors and voices, including a female voice. Spayde stated that she looked out the window and saw two male adults run across her front yard and go to the door at 197 Hampton Road.
 {¶ 37} After the men went to the door, she observed a short male who resembled Levi Drye run out of 197 Hampton Road and down the street toward Sherwood Drive. Spayde testified that the two men she saw get out of the vehicle ran after the short guy. One of the men tackled him and hit and kicked him a couple of times. She stated that she heard words, but could not make out what they were saying. Then they two men that were on the ground stood up, and the three of them walked back toward the house. Spayde testified that as they were walking back toward the house, she heard a female *Page 13 
voice at the car saying "hurry, hurry, we got to go." She then saw two males run out of the house, and the four men got in the car.
 {¶ 38} The victim, Ryan Hughett testified that in the early morning hours of March 6, 2005, he was sitting in his rec room when he heard a knock on the door and his dog started barking. When he heard a second knock, he looked outside and didn't see anyone. Hughett testified that as he was walking down the hallway toward his bedroom, the door busted in and several people came running inside the house. He indicated that he recognized one of them as Jesse Reed. While Hughett did not immediately recognize the appellant, he was able to identify him as one of the individuals who came into his house. He stated that he saw the appellant's face when he came in the door.
 {¶ 39} Hughett testified that he got into a fight with the intruders, and was forced back into his bedroom where Levi Drye was sleeping on the floor. He indicated that Drye got up and ran out of the house. Hughett stated that during the fight, he was trying to grab the phone to call the police because, at that time, he didn't know who was assaulting him. At some point, during the fight, he was hit with a pipe.
 {¶ 40} Hughett indicated that the fight lasted for about five minutes, and then the intruders ran out of the house chasing Levi Drye. When they left, he called the police and handed the phone to Drye because he was shaken up to tell them what happened. Hughett testified that as a result of the fight, he had a mark on the side of his head, little cuts on his face, and rashes or marks on his side in the shape of a pipe.
 {¶ 41} Patrolman John Van Houten with the Lexington Police Department testified that when he arrived at 197 Hampton Road, the first thing he noticed was the metal strike plate from the door laying on the floor. The door frame was splintered where the *Page 14 
strike plate had been attached. Inside the home, he made contact with Ryan Hughett and Levi Drye. Patrolman Van Houten testified that he observed injuries to Hughett's face and neck. When Hughett lifted his shirt, he observed a long red mark on his lower left back which looked like it was made by a bat or a stick. Inside the bedroom, Patrolman Van Houten testified that he found signs of a struggle such as items knocked over. He found a PVC pipe which, in his opinion, was consistent with the injuries he observed on the victim's back. Also found in the bedroom was a John Deere baseball hat which did not belong to anyone who lived there. Patrolman Van Houten described the hat as an "old school type of hat" with the mesh back and the nylon sponge front."
 {¶ 42} Several witnesses testified that the appellant was wearing a John Deere hat at the time of the crime. Chad Wyrick identified the hat as the one that he had in the back of his car at the time of the crime. He stated that he did not give the hat to the appellant, but he could have put it on when he was in the car. Wyrick stated that after the crime, the hat was missing and he never located it. Grant Weixel also testified that, prior to the crime, the appellant borrowed a green and white John Deere hat that was in Chad Wyrick's car. Weixel indicated that when they were leaving Lexington after the crime the appellant told Wyrick "I'm sorry man, I lost your hat." Jesse Reed also testified that the appellant was wearing a hat like State's Exhibit 13, the John Deer hat found inside 197 Hampton Road. He stated that the appellant got the hat from Chad Wyrick's vehicle. Reed also testified that on the night of March 5-6, 2005, he was wearing a red Ohio State hooded sweatshirt, and the appellant was wearing a hooded sweatshirt. He indicated that they both had their hoods up when they went to Hughett's house so that no one would see their faces. This matches Diane Spayde's description of the *Page 15 
individuals she saw come out of the house at 197 Hampton Road. She testified that of the four men she saw, one had a bright yellow sweatshirt with the hood up, two others had on light gray sweatshirts with the hood up, and one of the guys she saw exit the house had on a bright red sweatshirt with the hood up.
 {¶ 43} After an investigation by the Lexington Police Department, the appellant, Alyssa Shoemaker, and Jesse Reed were each indicted for one count of aggravated burglary, a felony of the first degree. Prior to the appellant's trial, Shoemaker entered into a plea agreement in which she agreed to testify truthfully against the appellant in exchange for a reduced charge of obstruction of justice. She received a five year suspended prison sentence with three and a half years of community control.
 {¶ 44} Jesse Read also reached a plea agreement with the State of Ohio. He pled guilty to aggravated burglary and agreed to testify truthfully against the appellant in exchange for a minimum three year sentence with the possibility of judicial release.
 {¶ 45} The appellant's jury trial commenced on March 2, 2006 and lasted six days. At the conclusion of the appellant's trial, he was found guilty of aiding and abetting aggravated burglary.
 {¶ 46} At his sentencing hearing on March 13, 2006, the trial court sentenced the appellant to six years in prison. The court also imposed a period of five years post release control and ordered appellant to pay restitution to the mother of Ryan Hughett in the amount of $400.00.
 {¶ 47} Appellant filed a timely notice of appeal and herein raises the following four assignments of error for our consideration: *Page 16 
 {¶ 48} "I. THE VERDICT IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 49} "II. THE TRIAL COURT ERRED PREJUDICIALLY BY ALLOWING THE INDICTMENT TO BE AMENDED TO CHARGE AIDING AND ABETTING A CO-DEFENDANT.
 {¶ 50} "III. THE ACCUSED WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 51} "IV. THE SENTENCE IMPOSED WAS UNDULY HARSH."
 I. II. {¶ 52} In his first assignment of error, appellant maintains that his conviction is against the weight of the evidence. In his second assignment of error appellant argues that the trial court erred by allowing the State to amend the indictment to charge aiding and abetting. We disagree.
 {¶ 53} Our standard of reviewing a claim a verdict was not supported by sufficient evidence is to examine the evidence presented at trial to determine whether the evidence, if believed, would convince the average mind of the accused's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, State v. Jenks (1991), 61 Ohio St. 3d 259.
 {¶ 54} The Supreme Court has explained the distinction between claims of sufficiency of the evidence and manifest weight. Sufficiency of the evidence is a question for the trial court to determine whether the State has met its burden to produce *Page 17 
evidence on each element of the crime charged, sufficient for the matter to be submitted to the jury.
 {¶ 55} Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
 {¶ 56} In State v. Thompkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541, the Ohio Supreme Court held "[t]o reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." Id., paragraph three of the syllabus. However, to "reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id., paragraph four of the syllabus;State v. Miller (2002), 96 Ohio St.3d 384, 2002-Ohio-4931 at ¶ 38,775 N.E.2d 498.
 {¶ 57} In the case at bar, appellant was convicted of aiding and abetting aggravated burglary. (6T. at 1001). R.C. 2911.11(A)(1) defines the offense of aggravated burglary as follows: "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the *Page 18 
following apply: (1) The offender inflicts, or attempts or threatens to inflict physical harm on another . . ."
 {¶ 58} R.C. 2923.03 provides: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 59} "* * *
 {¶ 60} "(2) Aid or abet another in committing the offense."
 {¶ 61} R.C. 2923.03(F) states "A charge of complicity may be stated in terms of this section, or in terms of the principal offense."
 {¶ 62} "The Supreme Court of Ohio clarified Ohio's position on the issue of complicity in State v. Perryman (1976), 49 Ohio St. 2d 14, vacated in part on other grounds sub nom, Perryman v. Ohio (1978),438 U.S. 911. The court unequivocally approved of the practice of charging a jury regarding aiding and abetting even if the defendant was charged in the indictment as a principal. Id. The court held that the indictment as principal performed the function of giving legal notice of the charge to the defendant. Id. Therefore, if the facts at trial reasonably supported the jury instruction on aiding and abetting, it is proper for the trial judge to give that charge. Perryman, supra at 27, 28." State v.Payton (April 19, 1990), 8th Dist. Nos. 58292, 58346.
 {¶ 63} R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See State v. Keenan (1998), 81 Ohio St.3d 133,151, 689 N.E.2d 929, 946, citing Hill v. Perini (C.A.6, 1986),788 F.2d 406, 407-408. State v. Herring (2002), 94 Ohio St.3d 246, 251762 N.E.2d 940, 949. *Page 19 
 {¶ 64} "The fact that the General Assembly intended to equate the prosecution and punishment of principals, aiders, abettors, and procurers is clear from R.C. 2923.03, which provides that it is no defense to a charge of complicity that no person with whom the accused was in complicity has been convicted as a principal offender. R.C.2923.03(A) (2) and (F) provide that one who aids and abets another in committing an offense is guilty of the crime of complicity, and may be prosecuted and punished as if he were the principal offender. State v.Bell (1976), 48 Ohio St.2d 270, 278, 358 N.E.2d 556. Aiding and abetting has been characterized as a substantive and independent offense so that aiders and abettors may be prosecuted and convicted as principals without the trial or conviction of the principal offender. Hartshorn v.State (1876), 29 Ohio St. 635.
 {¶ 65} "The federal rule that an aider and abettor is punishable as a principal is identical. Section 2, Title 18, U.S. Code; Reamer v. UnitedStates (C.A.6, 1955), 228 F.2d 906; Roberts v. United States (C.A.6, 1955), 226 F.2d 464." State v. Graven, supra, 52 Ohio St.2d at 115-116,369 N.E.2d 1205, 1207-1208.
 {¶ 66} A trial court's decision allowing an amendment that changes the name or identity of the offense charged constitutes reversible error regardless of whether the accused can demonstrate prejudice. State v.Honeycutt, Montgomery App. No. 19004, 2002-Ohio-3490. When an amendment is allowed that does not change the name or identity of the offense charged, the accused is entitled to a discharge of the jury or a continuance, "unless it clearly appears from the whole of the proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made."Id., quoting Crim.R. 7(D). A trial court's decision to *Page 20 
permit the amendment of an indictment is reviewed under an abuse of discretion standard. State v. Beach, 148 Ohio App.3d 181,772 N.E.2d 677, 2002-Ohio-2759, at ¶ 23, appeal not allowed, 96 Ohio St.3d 1516,2002-Ohio-4950. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting State v.Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144. To demonstrate error, defendant must show not only that the trial court abused its discretion, but that the amendment prejudiced his defense. Id.
 {¶ 67} In the case at bar, the State filed a Bill of Particulars on March 2, 2006 which identifies appellant and Jason Reed as the individuals who kicked the door in and assaulted the victim. The bill of particulars further identifies and describes the roles of Chad Wyrick, Nino Sorrenti, Matthew Pursley, Alyssa Shoemaker and Levi Drye. Such specificity performed the function of giving legal notice of the charge to the appellant. Accordingly, the bill of particulars adequately notified appellant that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. State v.Herring, supra.
 {¶ 68} Accordingly, appellant's second assignment of error is overruled.
 {¶ 69} That leaves for our consideration appellant's claims that the verdict is against the weight of the evidence.
 {¶ 70} Generally, a criminal defendant has aided or abetted an offense if he has supported, assisted, encouraged, cooperated with, advised, or incited another person to commit the offense. See State v. Johnson
(2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus. "`Participation in criminal intent may be inferred from presence, companionship *Page 21 
and conduct before and after the offense is committed.'" State v.Mendoza (2000), 137 Ohio App.3d 336, 342, 738 N.E.2d 822, quotingState v. Stepp (1997), 117 Ohio App.3d 561, 568-569, 690 N.E.2d 1342.
 {¶ 71} As set forth in the Statement of Facts, supra, the jury heard testimony that appellant exited the car and approached the house. (2T. at 352-53). Appellant along with Jesse Reed knocked on the door and then raised their legs to kick the door down. (Id.; 3T. at 457-58). Appellant bragged about hitting and kicking the victim while inside the house. ((Id. at 363; 3T. at 465; 467; 4T. at 483).
 {¶ 72} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant, at the very least, supported, assisted, encouraged, cooperated with, advised, or incited another person to commit the offenses with which he was convicted. Viewing this evidence linking appellant to the entry of the home and the assault of the victim inside the home in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant was well aware of, and participated in the break-in to the home and the beating of the victim.
 {¶ 73} We hold, therefore, that the state met its burden of production regarding each element of the crime of aiding and abetting aggravated burglary.
 {¶ 74} Although appellant cross-examined the witnesses and argued that he did not participate in the break-in or beating, and further that the State's witnesses were not credible because they had made deals with the State in exchange for their testimony against him, the weight to be given to the evidence and the credibility of the witnesses *Page 22 
are issues for the trier of fact. State v. Jamison (1990),49 Ohio St.3d 182, certiorari denied (1990), 498 U.S. 881.
 {¶ 75} Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections which cannot be conveyed to us through the written record, Miller v. Miller (1988),37 Ohio St. 3d 71.
 {¶ 76} In Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 81,461 N.E.2d 1273, the Ohio Supreme Court explained: "[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." See, also State v.DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
 {¶ 77} The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236 Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill (1964),176 Ohio St. 61, 67, 197 N.E.2d 548.; State v. Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v. Caldwell (1992),79 Ohio App.3d 667, *Page 23 607 N.E.2d 1096. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence.State v. Jenks (1991), 61 Ohio St. 3d 259, 574 N.E. 2d 492.
 {¶ 78} We conclude the trier of fact, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial. Viewing this evidence in a light most favorable to the prosecution, we further conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant was guilty of the crime of aiding and abetting aggravated burglary.
 {¶ 79} Accordingly, appellant's conviction is not against the manifest weight of the evidence.
 {¶ 80} Appellant's first assignment of error is overruled.
 III. {¶ 81} In his third assignment of error, appellant argues that he was denied effective assistance of trial counsel. We disagree.
 {¶ 82} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry in whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. Lockhart v. Fretwell (1993), 506 U.S. 364,113 S.Ct. 838, 122 L.Ed.2d 180; Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136.
 {¶ 83} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly *Page 24 
deferential. Bradley, 42 Ohio St. 3d at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
 {¶ 84} In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 {¶ 85} The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Bradley at 143, quotingStrickland at 697. Accordingly, we will direct our attention to the second prong of the Strickland test.
 {¶ 86} Initially, we note that appellant has failed to properly brief these issues on appeal. App.R. 16(A)(7) states that an appellant shall include in its brief "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contention, with citations to the authorities, statutes and parts of the record on which appellant relies." In this case, appellant has wholly failed to cite any specific place in the trial court's record where any of the errors are alleged to have occurred. *Page 25 
 {¶ 87} An appellate court is empowered to disregard an assignment of error presented for review due to lack of briefing by the party presenting that assignment. State v. Watson (1998),126 Ohio App.3d, 316, 710 N.E.2d 340, discretionary appeal disallowed in (1998),82 Ohio St.3d 1413, 694 N.E.2d 75, Hawley v. Ritley (1988), 35 Ohio St.3d 157,159, 519 N.E.2d 390, 392-393. "Errors not treated in the brief will be regarded as having been abandoned by the party who gave them birth."Uncapher v. Baltimore Ohio Rd. Co. (1933), 127 Ohio St. 351, 356,188 N.E. 553, 555.
 {¶ 88} Because appellant fails to properly reference portions of the record supporting his claim that defense counsel's performance constitutes error, defendant cannot demonstrate these claimed instances of error. See Daniels v. Santic, Geauga App. No. 2004-G-2570,2005-Ohio-1101, at ¶ 13-15. See, also, App.R. 12(A) (2) and 16(A) (7);Graham v. City of Findlay Police Dept. (Mar. 19, 2002), Hancock App. No. 5-01-32 (stating that "[t]his court is not obliged to search the record for some evidence of claimed error. * * * Rather, an appellant must tell the appellate court specifically where the trial court's alleged errors may be located in the transcript"); State ex rel. Physicians Commt. forResponsible Medicine v. Ohio State Univ. Bd. of Trustees,108 Ohio St.3d 288, 2006-Ohio-903, at ¶ 13; State ex rel. Petro v. Gold,166 Ohio App.3d 371, 2006-Ohio-943, at ¶ 94, appeal not allowed,110 Ohio St.3d 1439, 2006-Ohio-3862, reconsideration denied, 111 Ohio St.3d 1418,2006-Ohio-5083; Porter v. Keefe, Erie App. No. E-02-018, 2003-Ohio-7267, at ¶ 109-113.
 {¶ 89} In the alternative, we would note that the record in appellant's case does not support a finding that he was prejudiced by the performance of his trial counsel. *Page 26 
 {¶ 90} Appellant contends that counsel's trial strategy was unsound because the two trial attorney's representing him were unaware that the court could instruct the jury in terms of aiding and abetting, and trial counsels' decision to call two witnesses on his behalf did nothing to exculpate him. In short appellant argues his trial counsel should have argued he did not aid and abet Jesse Reed in the break-in and assault of the victim. (Appellant's Brief at 22-23).
 {¶ 91} "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. See Strickland,466 U.S., at 690, 104 S.Ct. 2052 (counsel is `strongly presumed' to make decisions in the exercise of professional judgment). That presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court `may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.' Massaro v. United States,538 U.S. 500, 505, 123 S.Ct. 1690, 1694, 155 L.Ed.2d 714 (2003). Moreover, even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight. See Bell, supra, at 702, 122 S.Ct. 1843;Kimmelman v. Morrison, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305
(1986); Strickland, supra, at 689, 104 S.Ct. 2052; United States v.Cronic, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)."Yarborough v. Gentry (2003), 540 U.S. 1, 8, 124 S.Ct. 1, 6.
 {¶ 92} A decision regarding which defense to pursue at trial is a matter of trial strategy "within the exclusive province of defense counsel to make after consultation *Page 27 
with his client." State v. Murphy, 91 Ohio St.3d 516, 524, 2001-Ohio-0112. This court can only find that counsel's performance regarding matters of trial strategy is deficient if counsel's strategy was so "outside the realm of legitimate trial strategy so as `to make ordinary counsel scoff." ` State v. Woullard, 158 Ohio App.3d 31,813 N.E.2d 964, 2004-Ohio-3395, ¶ 39, quoting State v. Yarber (1995),102 Ohio App.3d 185, 188, 656 N.E.2d 1322. Further, the Ohio Supreme Court has recognized that if counsel, for strategic reasons, decides not to pursue every possible trial strategy, defendant is not denied effective assistance of counsel. State v. Brown (1988), 38 Ohio St.3d 305, 319,528 N.E.2d 523. When there is no demonstration that counsel failed to research the facts or the law or that counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter.State v. Clayton (1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189, citingPeople v. Miller (1972), 7 Cal.3d 562, 573-574, 102 Cal.Rptr. 841, 498 P.2d 1089; State v. Wiley, 10th Dist. No. 03AP-340,2004-Ohio-1008 at ¶ 21.
 {¶ 93} In the case at bar, none of the instances raised by appellant rise to the level of prejudicial error necessary to find that he was deprived of a fair trial. Having reviewed the record that appellant cites in support of his claim that he was denied effective assistance of counsel, we find appellant was not prejudiced by defense counsel's representation of him. The result of the trial was not unreliable nor was the proceedings fundamentally unfair because of the performance of defense counsel.
 {¶ 94} Appellant's third assignment of error is overruled. *Page 28 
 IV. {¶ 95} In his fourth assignment of error appellant contends that the sentenced imposed is too harsh because his co-defendants received lesser sentences. We disagree.
 {¶ 96} At the outset we note, there is no constitutional right to an appellate review of a criminal sentence. Moffitt v. Ross (1974),417 U.S. 600, 610-11, 94 S.Ct. 2437, 2444; McKane v. Durston (1894),152 U.S. 684, 687, 14 S. Ct. 913. 917; State v. Smith (1997),80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668. This proposition has been firmly established as noted by the Ohio Supreme Court: "[t]he United States Supreme Court in Estelle v. Dorrough (1975), 420 U.S. 534, 536,95 S.Ct. 1173, 1175, 43 L.Ed.2d 377, 380, held, `there is no federal constitutional right to state appellate review of state criminal convictions.' The Supreme Court has stated that `the right of appeal is not essential to due process, provided that due process has already been accorded in the tribunal of first instance.' State ex rel. Bryant v.Akron Metro. Park Dist. (1930), 281 U.S. 74, 80, 50 S.Ct. 228, 230, 74 L.Ed. 710, 715. The United States Supreme Court laid out the rationale most clearly in Ross v. Moffitt (1974), 417 U.S. 600, 610-611,94 S.Ct. 2437, 2444, 41 L.Ed.2d 341, 351:
 {¶ 97} The defendant needs an attorney on appeal not as a shield to protect him against being `hauled into court' by the State and stripped of his presumption of innocence, but rather as a sword to upset the prior determination of guilt. This difference is significant for, while no one would agree that the State may simply dispense with the trial stage of proceedings without a criminal defendant's consent, it is *Page 29 
clear that the State need not provide any appeal at all'". State v.Smith (1997), 80 Ohio St.3d 89, 97-97, 1997-Ohio-355, 684 N.E.2d 668,680.
 {¶ 98} An individual has no substantive right to a particular sentence within the range authorized by statute. Gardner v. Florida (1977),430 U.S. 349, 358, 97 S.Ct. 1197, 1204-1205. In other words "[t]he sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus. It is not the duration or severity of this sentence that renders it constitutionally invalid. . . ." Townsend v. Burke (1948), 334 U.S. 736,741, 68 S.Ct. 1252, 1255. However, "[t]he defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process. See Witherspoon v. Illinois,391 U.S. 510, 521-523, 88 S.Ct. 1770, 1776-1778, 20 L.Ed.2d 776". Gardner v.Florida (1977), 430 U.S. 349, 358, 97 S.Ct. 1197, 1204-1205.
 {¶ 99} In the case at bar, appellant was convicted of a felony of the first degree. (T., March 13, 2006 at 2).
 {¶ 100} Pursuant to the express language of R.C. 2929.13(D), the court need not make any findings of fact concerning the purposes and principles of sentencing under section 2929.11 of the Revised Code when sentencing an offender for a felony of the first or second degree because the legislature has determined that a prison term is necessary to comply with the purposes and principles of sentencing. The statute requires findings of fact only when the trial court overcomes the presumption of imprisonment and sentences the offender to community control sanctions. See, State v. *Page 30 Mathis, 109 Ohio St.3d 54, 846 N.E.2d 1, 2006-Ohio-855 at ¶ 27. ("Judicial findings must be provided only for downward departures, such as when a court refuses to impose the presumptive prison term under R.C.2929.13(D) or when a court grants a judicial release. See R.C. 2929.20(H)").
 {¶ 101} There is no requirement in R.C. 2929.12 that the trial court states on the record that it has considered the statutory criteria concerning seriousness and recidivism or even discussed them. State v.Polick (1995), 101 Ohio App.3d 428, 431; State v. Gant, Mahoning App. No. 04 MA 252, 2006-Ohio-1469, at ¶ 60 (nothing in R.C. 2929.12 or the decisions of the Ohio Supreme Court imposes any duty on the trial court to set forth its findings), citing State v. Cyrus (1992),63 Ohio St.3d 164, 166; State v. Hughes, Wood App. No. WD-05-024, 2005-Ohio-6405, at ¶ 10 (trial court was not required to address each R.C. 2929.12 factor individually and make a finding as to whether it was applicable in this case), State v. Woods, 5th Dist. No. 05 CA 46,2006-Ohio-1342 at ¶ 19 (". . . R.C. 2929.12 does not require specific language or specific findings on the record in order to show that the trial court considered the applicable seriousness and recidivism factors"). (Citations omitted).
 {¶ 102} In State v. Hill (1994), 70 Ohio St.3d 23, 635 N.E.2d 1248, the defendant was convicted of complicity to trafficking in marijuana, and sentenced to one year in prison and further ordered to forfeit his apartment complex. His co-defendant received probation instead of a prison sentence. Id. at 29, 635 N.E.2d at 1252. On appeal, he argued that the trial court abused its discretion by giving him a harsher sentence than was given his co-defendant. Id. The Ohio Supreme Court observed: "[t]here is no question that on its face the sentence received by appellant, when compared to *Page 31 
Newbauer's punishment, is disproportionate. Given the fact that Newbauer received probation, appellant's one-year prison sentence does appear to be harsh. However, as a general rule, an appellate court will not review a trial court's exercise of discretion in sentencing when the sentence is authorized by statute and is within the statutory limits. See, generally, Toledo v. Reasonover (1965), 5 Ohio St.2d 22, 24,34 O.O.2d 13, 14, 213 N.E.2d 179, 180-181. See, also, State v. Cassidy (1984),21 Ohio App.3d 100, 102, 21 OBR 107, 108-109, 487 N.E.2d 322, 323;State v. Burge (1992), 82 Ohio App.3d 244, 249, 611 N.E.2d 866, 869; andState v. Grigsby (1992), 80 Ohio App.3d 291, 302, 609 N.E.2d 183, 190.
 {¶ 103} Appellant cites no precedent, or any other authority, for reversal of an otherwise valid sentence on the basis that more culpable co-defendants were not punished more severely. There is no requirement that co-defendant's receive equal sentences. State v. Lloyd, 11th Dist. No. 2002-L-069, 2003-Ohio-6417 at ¶ 21; United State v. Frye (6th Cir. 1987), 831 F.2d 664, 667. Each defendant is different and nothing prohibits a trial court from imposing two different sentences upon individuals convicted of similar crimes.State v. Aguirre, 4th Dist. No. 03CA5, 2003-Ohio-4909 at ¶ 50. In this case, there is nothing in the record to show that the difference in appellant's sentence from those of his co-defendants was the result of anything other than the individualized factors that were applied to appellant. State v. Beasley, 8th Dist. No. 82884, 2004-Ohio-988 at ¶ 23.
 {¶ 104} Appellant's fourth assignment of error is overruled. *Page 32 
 {¶ 105} For the foregoing reasons, the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed.
 Gwin, P.J., Hoffman, J., and Farmer, J., concur. *Page 33 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed. Costs to appellant. *Page 1